# United States Court of Appeals

## For the First Circuit

No. 99-1328

BROTHERHOOD OF LOCOMOTIVE ENGINEERS,
UNITED TRANSPORTATION UNION,

Plaintiffs, Appellees,

v.

SPRINGFIELD TERMINAL RAILWAY COMPANY,
AROOSTOOK AND BANGOR RESOURCES, INC.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Stahl, Circuit Judge
Cyr, Senior Circuit Judge,
and Lipez, Circuit Judge.

Thad B. Zmistowski, with whom Glen L. Porter and Eaton, Peabody, Bradford & Veague, P.A., were on brief for appellants.
Clinton J. Miller, III, General Counsel, for appellee United Transportation Union.
Harold A. Ross, with whom Ross & Kraushaar Co., L.P.A., was on brief for appellee Brotherhood of Locomotive Engineers.

**LIPEZ, <u>Circuit Judge</u>**. This case requires us to decide whether the district court properly issued a Railway Labor Act ("RLA") injunction barring a wood products company controlled by owners of a railroad from doing switching work historically performed by the railroad's unions. <u>See</u> 45 U.S.C. § 151 and seq. The district court issued the injunction after finding that the Brotherhood of Locomotive Engineers and United Transportation Union (the "Unions") were engaged in a "major" dispute with Springfield Terminal Railway Company ("Springfield") and that Springfield was using Aroostook and Bangor Resources, Inc. ("ABR") to violate its collective bargaining agreement. Springfield and ABR (the "appellants") argue that ABR, although owned and controlled by Springfield's owners, is an independent wood products company not subject to the RLA and therefore not subject to the district court's order that it stop performing switching for Springfield customers while RLA mediation procedures are underway. We reject the contention that ABR is not subject to the injunctive provisions of the RLA, and we affirm both the district court's finding that there was a "major" dispute between Springfield and its Unions and the district court's injunction against ABR.

# I.

## A. The Labor Dispute

We begin by sketching the facts of this labor dispute, reserving for later a more detailed discussion of the district court's findings. In doing so, "[w]e recite the facts in the light most favorable to the district court's findings of fact." Servicos Comerciales Andinos v. General Electric Del Caribe, Inc., 145 F.3d 463, 466 (1st Cir. 1998).

In 1995 the Unions and Springfield negotiated a collective bargaining agreement that governs the rates of pay, rules, and working conditions for Springfield locomotive engineers, conductors, and trainmen. The agreement specifically provides that union employees "shall perform any and all services under the direct control of the Carrier required for the make up of trains and/or the movement of cars and trains over and through the Carrier's trackage and in its business of servicing industrial sidings."

One such "business of servicing industrial sidings" is switching, a service that rail carriers often provide for their customers on the customers' properties. Springfield employees who are union members have historically provided this service to many of Springfield's line-haul railway customers. Pursuant to the collective bargaining agreement, the union members

performing these switching services have been paid and treated identically to engineers, conductors, and trainmen involved in other aspects of Springfield's railway business.

In 1996 Springfield proposed that the union members engaged in switching accept a twenty-six percent pay cut and less favorable working conditions. Although the Unions' leaders initially resisted, they eventually agreed to submit a proposed pay cut to their respective memberships. The memberships of both Unions rejected the changes in August 1996, opting instead to maintain the more favorable terms of the collective bargaining agreement. Despite the vote, Springfield persisted in seeking a pay cut for switching work.

Unable to persuade the Unions to accept lower pay for switching, Springfield took a series of steps in the spring of 1998 that resulted in ABR performing switching that had previously been done by Springfield's unions. ABR is a non-unionized company located along Springfield's railway lines engaged primarily in the manufacture of clothes pins and other wood products. Springfield executed an agreement with ABR in April 1998 giving ABR joint use of some railway tracks, and Springfield personnel trained two non-union ABR employees to use a leased track-mobile to perform the switching at the ABR wood products mill previously done by Springfield's union employees.

While joint use agreements of this type are fairly common in the railway industry, Springfield's next move was unusual. Shortly after executing the joint use agreement, Springfield suggested to ABR that it truck its switching equipment from place to place so that it could perform switching work for various Springfield railway customers that had previously used Springfield (and the Unions) for switching. ABR agreed and by May of 1998 it was providing switching services for Springfield customers Lincoln Pulp & Paper ("Lincoln") and Passadumkeag Stud Mill, owned by Champion International, Inc. ("Champion"). ABR also investigated performing switching work for other Springfield customers.

Although nominally an independent corporation, ABR is not unrelated to Springfield. Springfield is a wholly owned subsidiary of Guilford Transportation Industries, Inc. ("Guilford"), a holding company that owns several railroads in New England.[1] Guilford, in turn, was closely held (at the time of the dispute) by four individuals who also served as its directors: David Andrew Fink, David Armstrong Fink, Richard Kelso and Timothy Mellon. Both of the Finks and Mellon were also the sole owners of ABR. The three companies shared the same four directors at the time the dispute arose: all three ABR owners

---

[1]Guilford's holdings include the Maine Central Railway, the Portland Terminal Company and the Boston & Maine Corporation.

plus Richard Kelso. While David Andrew Fink served as President of Springfield, his son, David Armstrong Fink, served as President of ABR (as well as a Director of Guilford and, later, as an Executive Vice-President at Springfield). It was David Armstrong Fink who met with a Springfield vice-president involved in the failed labor negotiations about the possibility of ABR performing the switching work previously done by the Unions.

**B. The Railway Labor Act**

The Unions filed suit under the RLA, arguing that Springfield was using ABR to violate the terms of its collective bargaining agreement. Under the RLA, a district court has no jurisdiction to rule on the merits of a labor dispute. Rather, the court may only decide what type of statutorily mandated dispute resolution procedure is appropriate, depending on the category of the dispute. See Elgin, Joilet & E. Ry. v. Burley, 325 U.S. 711, 722-23 (1945). Minor disputes under the RLA are those in which the carrier's challenged policies are at least arguably permitted under the existing collective bargaining agreement.[2] If the dispute is "minor," the district court

_____

[2]A minor dispute

contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a

dismisses the case in favor of binding arbitration. Major disputes, on the other hand, relate to carrier attempts to modify rates of pay, rules or working conditions in a fashion not even arguably covered by the collective bargaining agreement.[3] See Brotherhood of Locomotive Eng'rs v. Boston & Maine Corp., 788 F.2d 794, 797 (1st Cir. 1986); Maine Central R.R., Co. v. United Transp. Union, 787 F.2d 780, 782 (1st Cir. 1986). If the dispute is "major," the Act provides for extensive, non-binding mediation procedures.[4] In major disputes— unlike minor disputes— the RLA

---

> particular provision with reference to a specific situation or to an omitted case. . . . In either case the claim is to rights accrued, not merely to have new ones created for the future.

Elgin, 325 U.S. at 723.

[3]A major dispute

> relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

Elgin, 325 U.S. at 723.

[4]The dispute resolution procedures for major disputes include a "rather elaborate machinery for negotiations, mediation, voluntary arbitration, and conciliation." Detroit and Toledo Shore Line R.R. Co. v. United Transp. Union, 396 U.S. 142, 148-49 (1969). For simplicity's sake, we will refer to all of these processes as the major dispute "mediation" procedures.

bars the carrier from implementing the contested change until the mediation efforts are exhausted.  See Detroit and Toledo Shore Line R.R. Co. v. United Transp. Union, 396 U.S. 142, 150-53 (1969). To invest these status quo requirements with judicial authority, the district court is permitted to issue an injunction ordering the parties to maintain the pre-dispute status quo while the mediation procedures take place.  See Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 303 (1989) ("The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures . . . .").

## C.  The District Court Proceedings

The Unions argued to the district court that the arrangement between Springfield and ABR created a major dispute because Springfield was seeking to modify the collective bargaining agreement's rules on pay and working conditions for those engaged in switching.  The Unions claimed that Springfield was using ABR to implement this contested change before RLA mediation procedures were exhausted, thereby violating the RLA's requirement that the carrier and union maintain the pre-dispute status quo. The appellants objected, arguing, inter alia, that Springfield had not done anything to alter the collective

bargaining agreement and that ABR was acting independently in performing switching work for Springfield customers.

On the basis of a stipulated record, the district court ruled that the dispute was major under the RLA. In so concluding, the court found that Springfield was attempting to evade the collective bargaining agreement by "allow[ing] a corporate relative not bound by the collective bargaining agreement to perform work covered by the collective bargaining agreement." The court also rejected the appellants' other defenses: their assertion that the arrangement with ABR did not alter the pay or working conditions of the Unions and their assertion that the arrangement was covered by "implied terms" in the collective bargaining agreement. The court then enjoined ABR from performing industrial switching for Lincoln, Champion and any companies for which Springfield currently provided switching services, pending the outcome of the RLA mediation procedures. ABR and Springfield appeal.[5]

---

[5]The Unions have suggested that we lack jurisdiction over this appeal because the Appellants filed their notice of appeal before the injunction was formally recorded. We disagree.

When the district court entered its order on February 5, 1999, it asked the Unions to prepare the formal language of the injunction, to present that language to the defendants, and to file it with the court by February 19. The Unions did so, and on March 2, 1999, the district court signed the injunction. Prior to the court's approval of the injunction's language, Springfield and ABR filed their notice of appeal.

A decision is final if it "ends the litigation on the merits

## II.

Appellants assert that there is no major dispute under the RLA because Springfield made no changes at all to the collective bargaining agreement. Rather, appellants claim, Springfield's rail customers simply chose to use ABR for better service of their switching needs. Since ABR is a company independent from Springfield– a wood products shop and not a railway– the district court erred in attributing ABR's actions to Springfield, despite the nearly total overlap in ownership.

---

and leaves nothing for the court to do but execute the judgment." Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 373 (1981) (internal quotation marks and citation omitted). The Supreme Court has allowed appeals even when a district court still anticipated "[f]urther rulings . . . in administering its decree." Brown Shoe Co. v. United States, 370 U.S. 294, 308 (1962); see also Budinich v. Becton Dickinson & Co., 486 U.S. 196, 199 (1988) ("A question remaining to be decided after an order ending litigation on the merits does not prevent finality if its resolution will not alter the order or moot or revise decisions embodied in the order."). At the time the appeal was filed, the district court had already ruled that the dispute was major and that a status quo injunction was needed. The fact that wording had not been determined did not defeat the judgment's finality.

Even if the filing of the appeal were premature, we would still have jurisdiction. Federal Rule of Appellate Procedure 4(a)(2) provides that a "notice of appeal filed after the court announces a decision or order but before the entry of the judgment or order shall be treated as filed after such entry and on the day thereof." Thus if a party files an appeal prematurely, this rule preserves its effect. See FirstTier Mortgage Co. v. Investors Mortgage Ins. Co., 498 U.S. 269, 273 (1991); Negran v. Hernandez, 145 F.3d 410, 414 (1st Cir. 1998).

We agree with Springfield that the dispute cannot be labeled "major" simply because the collective bargaining agreement required switching to be performed by the Unions. If ABR was truly acting on its own, an injunction against ABR would have been improper. The collective bargaining agreement is between Springfield and the Unions; ABR is not a party. Moreover, the RLA applies only to carriers; ABR is not a carrier. See 45 U.S.C. § 151, First. Unless the district court properly treated ABR as the alter ego of Springfield, and properly disregarded the separateness of the two corporations by piercing the corporate veil of ABR, it could not attribute ABR's conduct to Springfield and enjoin ABR from switching Springfield customers. We must therefore assess whether veil piercing was appropriate.

In doing so, we must be clear about the sense in which we are using these terms. See Note, Piercing the Corporate Veil: The Alter Ego Doctrine under Federal Common Law, 95 Harv. L. Rev 853 (1982) (noting that the terms are amorphous). To pierce a corporate veil means to disregard its corporate formalities. See Black's Law Dictionary 1168 (7th ed. 1999) (noting that "piercing the corporate veil" and "disregarding the corporate entity" are the same thing). The veil may be pierced if one corporation is not an independent entity, but rather the mere "alter ego" of

another.  1 James D. Cox, Thomas Lee Hazen & F. Hodge O'Neal, Corporations § 7.8 at 7.17 (1995);cf. Black's Law Dictionary 385 (7th ed. 1999) (defining "alter ego" as a "corporation used by an individual to conduct personal business").  In this case, ABR is Springfield's "alter ego" in the context of this labor dispute if ABR is acting as a non-union branch of Springfield rather than as an independent company.  Likewise, when we speak of "piercing" ABR's veil, we mean simply disregarding its corporate separateness in the limited context where it is allegedly serving as an alter ego.

## A.  Federal Common Law of Veil Piercing

We must determine whether state law or federal common law  governs the veil-piercing inquiry.  In federal question cases, such as this one, we look to federal choice of law principles.  See Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 642 (1981); see also Edelmann v. Chase Manhattan Bank, 861 F.2d 1291, 1294 (1st Cir. 1988).  If the federal statute in question demands national uniformity, federal common law provides the determinative rules of decision.  See United States v. Kimbell Foods, Inc., 440 U.S. 715, 728 (1979).

National uniformity is essential in the interpretation of labor law.  Federal courts have fashioned a body of federal common law to govern labor disputes, recognizing that harmonious

labor relations are essential to interstate commerce. <u>See, e.g.,</u> <u>Textile Workers Union</u> v. <u>Lincoln Mills</u>, 353 U.S. 448, 456 (1957). This general principle holds true for the RLA, a statute described as an industry-wide bargain between carriers and their unions aimed at preventing disruptions to interstate commerce. <u>See</u> <u>Shore Line</u>, 396 U.S. at 148-49; <u>Trans World Airlines, Inc.</u> v. <u>Independent Fed'n of Flight Attendants</u>, 489 U.S. 426, 432 (1989) (noting that "federal common labor law . . . may be helpful in deciding cases under the RLA."). National uniformity is particularly important in those RLA cases, like this one, that "implicate the consensual processes which labor law was designed to promote." <u>International Ass'n of Machinists & Aerospace Workers</u> v. <u>Aloha Airlines, Inc.</u>, 790 F.2d 727, 734 (9th Cir. 1986).

A common federal standard is particularly needed in RLA veil-piercing cases. If courts were to rely on state law to determine when veil piercing was appropriate, RLA collective bargaining agreements might include some companies in one state and other companies in a neighboring state. A railway with operations in more than one state could find itself unable to determine whether and when the RLA applied to it at all. Likewise, a federal veil-piercing standard is required to prevent carriers from using non-carriers (which are not themselves

-13-

subject to the RLA) to circumvent federal labor law requirements. Although state law creates the corporate form, "the question of liability [for violation of federal regulations] is a federal question. The policy underlying a federal statute may not be defeated by an assertion of state power." Anderson v. Abott, 321 U.S. 349, 365 (1944)(piercing the veil); H.P. Lambert Co. v. Secretary of the Treasury, 354 F.2d 819, 822 (1st Cir. 1965) ("However important it may be in other respects, the fiction of the corporate entity cannot stand athwart sound regulatory procedure.").

To say that federal common law applies in this case does not fully resolve the matter. As we recently acknowledged, the federal standard "for when it is proper to pierce the corporate veil is notably imprecise and fact-intensive." Crane v. Green & Freedman Baking Co., 134 F.3d 17, 21 (1st Cir. 1998); see also Note, supra, 95 Harv. L. Rev. at 852 (noting that federal common law on veil piercing is amorphous and must be flexibly applied). Federal courts are not bound by "the strict standards of the common law alter ego doctrine which would apply in a tort or contract action." Capital Tel. Co. v. FCC, 498 F.2d 734, 738 (D.C. Cir. 1974). Nor is there any "litmus test in the federal courts governing when to disregard corporate form." Alman v. Danin, 801 F.2d 1, 3 (1st Cir. 1986). Instead, the rule

in federal cases is founded only on the broad principle that "a corporate entity may be disregarded in the interests of public convenience, fairness and equity." Town of Brookline v. Gorsuch, 667 F.2d 215, 221 (1st. Cir. 1981).

In Gorsuch we recognized that this principle must be applied with sensitivity to the demands of the federal statute at issue:

> In applying this rule, federal courts will look closely to the purpose of the federal statute to determine whether the statute places importance on the corporate form, an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine.

Id. (internal citations omitted); see also First National City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611, 630 (1983) ("[T]he Court has consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies."); United Elect., Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1091 (1st Cir. 1992) ("[I]n federal question cases, courts are wary of allowing the corporate form to stymie legislative policies").  Given the need to consider the purposes of the federal statute, we have crafted what we termed a "less rigorous" veil-piercing standard tailored to ERISA cases in order to fulfill that statute's goals. 163 Pleasant St., 960 F.2d at 1092 ("The rationale for

-15-

encouraging a modicum of corporate disregard in ERISA cases is grounded on congressional intent."); see also Alman v. Danin, 801 F.2d 1, 4 (1st Cir. 1986) ("Indeed, deferring too readily to the corporate identity may run contrary to the explicit purposes of [ERISA].")  Other Circuits too have considered the specific legislative policies at issue and whether piercing the corporate veil is necessary to further those policies.  See Stotter & Co. v. Amstar Corp., 579 F.2d 13, 18-19 (3rd Cir. 1978) (veil piercing necessary to fulfill purposes of Clayton Act); Capital Tel. Co., 498 F.2d at 738 (liberal veil piercing to fulfill purposes of Communications Act of 1934); Kavanaugh v. Ford Motor Co., 353 F.2d 710, 716-17 (7th Cir. 1965) (veil piercing necessary to fulfill purposes of Dealers' Day in Court Act).  We must therefore consider the RLA status quo provisions to determine when veil piercing is necessary to prevent frustration of the RLA's purposes.

**B. The Railway Labor Act and Veil Piercing**

"[T]he major purpose of Congress in passing the Railway Labor Act was to provide a machinery to prevent strikes." Texas & N.O.R. Co. v. Brotherhood of Ry. & S.S. Clerks, 281 U.S. 548, 565 (1930) (internal quotation marks omitted).  The risk of strikes was considered to be "particularly acute in the area of 'major disputes,' those disputes involving the formation of

collective agreements and efforts to change them." <u>Shore Line</u> 396 U.S. at 148. For these disputes, the railroad and union representatives who drafted the Act favored non-binding mediation. <u>See</u> <u>id.</u> at 148-49. To prevent strikes from breaking out while mediation was underway, the Act required that both parties maintain the pre-dispute status quo. <u>See</u> <u>id.</u> at 149. As the Court noted in <u>Shore Line</u>, the Act's status quo provision was "central to its design":

> Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike. In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout. Moreover, since disputes usually arise when one party wants to change the status quo without undue delay, the power which the Act gives the other party to preserve the status quo for a prolonged period will frequently make it worth while for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce.

<u>Id.</u> at 150. The Act fashioned a fundamental compromise: during the RLA mediation procedures, the union must refrain from striking and the carrier must refrain from implementing the contested policy.

The <u>Shore Line</u> Court emphasized that the status quo provisions of the RLA must be applied flexibly to fulfill the

-17-

statute's goal. In <u>Shore Line</u>, the carrier had argued that the RLA required it to preserve the status quo only in those working conditions explicitly covered by the parties' collective bargaining agreement. <u>See</u> <u>id.</u> at 147-48. Since the collective bargaining agreement was silent on the challenged practice, the carrier argued that it should be allowed to continue this practice while RLA mediation to modify the agreement was ongoing. <u>See</u> <u>id.</u> The Court rejected this interpretation, calling it "fundamentally at odds with the Act's primary objective -- the prevention of strikes. . . . If the railroad is free at this stage to take advantage of the agreement's silence and resort to self-help, the union cannot be expected to hold back its own economic weapons, including the strike." <u>Id.</u> at 154-55. The Court therefore held that the status quo provision must be "broadly conceived" to preserve the "actual, objective working conditions out of which the dispute arose, irrespective of whether these conditions are covered in an existing collective agreement." <u>Id.</u> at 143.

The Court's effort to give practical meaning to the status quo requirement would be circumvented if carriers could use third parties to alter the collective bargaining agreement while the dispute was ongoing. Thus courts have held that a carrier may not hire an independent company to carry out the

changes that the unions protest. See e.g., St. Louis S.W. Ry. v. Brotherhood of R.R. Signalmen, 665 F.2d 987, 995 (10th Cir. 1981) ("There is nothing which leaves room for a suggestion that the [RLA] can be avoided by employing a contractor to perform the work."). In the same vein, the RLA is defeated if a carrier uses a related corporation to alter the status quo. The RLA itself acknowledges the possibility that carriers may attempt to use affiliates to achieve their goals by giving courts jurisdiction over railroads and those non-railroads that are "directly or indirectly owned or controlled by or under common control with any carrier by railroad. . . ." 45 U.S.C. § 151. While this provision alone does not justify the issuance of an injunction against a non-railroad corporation, it emphasizes that courts must look beyond corporate formalities if the nominally independent corporation is serving as the alter ego of the carrier.

In several cases, courts have engaged in veil piercing when the carrier used an affiliate to escape its collective bargaining agreement and violate the status quo requirements of the RLA. In Burlington Northern R.R. Co. v. United Transp. Union, 862 F.2d 1266 (7th Cir. 1988), the railroad, after failing to convince a local union to accept smaller crews for a particular train service, transferred the work to a subsidiary, Winona

Bridge.  Finding that the subsidiary was "serving as the alter ego" of the carrier, the court held that "a carrier cannot evade its duties under a collective bargaining agreement or the RLA by directing business to an entity within the same corporate family and not obligated by the existing collective bargaining agreement."  Id. at 1275.  Similarly, in Butte, Anaconda & Pacific Ry. v. Brotherhood of Locomotive Firemen and Enginemen, the carrier argued that its major dispute mediation procedures could be "terminated" after a wholly owned subsidiary began performing the disputed work. 268 F. 2d 54, 59 (9th Cir. 1959). The court acknowledged that there would no longer be a major dispute if the work was performed by "an independent shipper, not acting in concert with its carrier." Id.  After assessing the links between carrier and subsidiary, however, the court held that the acts of the latter "must be regarded as the act of the carrier.  Otherwise, a carrier by interrelation with its shippers would always have it within its power to circumvent the mediation provision of the Railway Labor Act." Id. at 59-60.[6]

---

[6]Other courts have also noted that a carrier cannot evade the requirements of the RLA (which applies to air carriers as well as railroads) by transferring work to a corporate relative not party to the collective bargaining agreement. See Air Line Pilots Ass'n, Int'l. v. Transamerica Airlines, Inc., 817 F.2d 510 (9th Cir.1987) (noting that a carrier would violate the RLA status quo requirements if the union could prove that it transferred work to a subsidiary to evade these requirements); Air Line Pilots Ass'n, Int'l. v. Texas Intl' Airlines, Inc., 656

Noting that neither Burlington nor Butte detail the standard that must be applied in an RLA veil-piercing inquiry, appellants claim that these cases support RLA veil piercing only when the pierced corporation is a wholly owned subsidiary of the carrier.  We reject this reading.  First, while these cases deal with wholly owned subsidiaries, they do not state that veil piercing is inappropriate for other types of corporate relatives.  In fact, Burlington speaks of piercing not just subsidiaries, but of entities in the "same corporate family."  862 F.2d at 1275.  While alter ego liability may be most common in an ordinary parent-subsidiary context, "the equitable doctrine of piercing the corporate veil is not limited to the parent-subsidiary relationship." C M Corp. v. Oberer Dev. Co., 631 F.2d 536, 538 (7th Cir. 1980).  Indeed, "[t]he separate corporateness of affiliated corporations owned by the same parent may be equally disregarded under the proper circumstances."  In re Bowen Transps., Inc., 551 F.2d 171, 179 (7th Cir. 1977).  Courts have pierced the veil in cases involving "sibling" corporations, and in cases involving even more intricately arranged corporate structures.  See Minnesota Power v. Armco, Inc., 937 F.2d 1363,

F.2d 16, 19 (2d Cir. 1981) ("Nor could TXI permissibly transfer existing business flown by ALPA pilots to a newly formed corporate alter ego for the purpose of displacing the work of ALPA pilots.").

1364 (8th Cir. 1991) (complex partnership scheme); cf. Century Oil Tool, Inc. v. Production Specialties, Inc., 737 F.2d 1316, 1317 (5th Cir. 1984) ("[W]e see no relevant difference between a corporation wholly owned by another corporation, two corporations wholly owned by a third corporation or two corporations wholly owned by three persons who together manage all affairs of the two corporations."). The misuse of the corporate form to evade federal regulatory requirements may be easier to prove, as an evidentiary matter, when there is a straightforward parent-subsidiary relationship. However, the RLA status quo provisions could be thwarted if courts were categorically barred from considering other types of corporate relationships that were being used to avoid a collective bargaining agreement.

Of course, the corporate ties between the carrier and the related corporation provide only a starting point for the analysis.

Common ownership by itself is insufficient to pierce the veil. See United States v. Bestfoods, 118 S. Ct. 1876, 1884 (1998) ("[A] parent corporation . . . is not liable for the acts of its subsidiaries."). The record must include evidence that the carrier used the related corporation for the purpose of evading the collective bargaining agreement and the status quo requirements of the RLA. In making this determination, no single

factor is dispositive. The district court may consider the chronology of events: if the carrier only transferred work to the related corporation after unsuccessful union negotiations, that fact may suggest that the carrier shifted the work in an effort to avoid the RLA status quo provisions. See Burlington, 862 F.2d at 1274 ("Thus Burlington plainly acknowledged that Winona Bridge was Burlington's second choice, an alternative to unsuccessful union negotiations."). That inference of evasion may be stronger when the work shifted to the related corporation is distinct from the related corporation's primary line of business. Other factors may also be relevant, such as whether the carrier and the related corporation fail to observe separate corporate formalities, or whether the related corporation is undercapitalized. See id. at 1276 n.6 (noting that subsidiary had "no equipment or rail-service employees").

We emphasize, however, that the record need not portray the related corporation as a "sham" business, expressly created or operated primarily to defeat the RLA. In Butte, for example, the subsidiary had been created and then operated as a separate, legitimate business until the railroad used it to defeat the RLA obligations. 268 F. 2d at 54. It would make little sense to ignore current relationships and arrangements between corporations, and thereby grant the railroad immunity from veil

piercing, in those cases where the related corporation being used to defeat the RLA was originally formed (or simultaneously used) for a legitimate purpose. It must be remembered that veil piercing in the RLA context serves a different function than it does in the ordinary state law veil piercing cases. In a typical tort or contract case, the primary purpose of the veil-piercing analysis is exposure of the assets of one corporation for payment of the debts or obligations of a related corporation. In the RLA major dispute proceedings, veil piercing operates only to block the related corporation from assisting the carrier in altering the collective bargaining agreement before mediation procedures are exhausted. Indeed, there is no final judgment on the merits against the related corporation: if the RLA mediation procedures do not achieve a negotiated solution, the law will not block the related corporation from engaging in the contested activities. See Consolidated Rail Corp. v. Railway Labor Executives' Ass'n., 491 U.S. 299, 303 (1989) ("Once this protracted process ends and no agreement has been reached, the parties may resort to the use of economic force."); Brotherhood of Locomotive Engineers v. Baltimore & Ohio R.R., 372 U.S. 284, 291 (1963).

In this way, RLA veil piercing is similar to the well-established practice of extending the scope of an injunction to include non-parties acting in concert with parties to defeat the

injunction's purpose. See Fed. R. Civ. P. 65(d) (injunctions can block activities of non-parties who act "in active concert or participation" with enjoined parties). In RLA cases (unlike in most cases where injunctions are sought), the substantive law itself imposes the duty to maintain the status quo. In a major dispute, the Act requires that "rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has finally been acted upon" through the Act's mediation procedures. 45 U.S.C. § 156; see also Shore Line 396 U.S. at 150-53 (describing various status quo provisions in the RLA). If in subsequent proceedings the district court determines that the carrier is acting in concert with a related corporation to violate these self-executing status quo provisions, the injunction should be fashioned to reach the related corporation as well.

With these principles in mind, we turn to the findings of the district court.

## C. The District Court's Findings

While we review the district court's legal conclusions de novo, see Sierra Fria Corp. v. Donald J. Evans, P.C., 127 F.3d 175, 181 (1st Cir. 1997), we accept its factual findings unless they are clearly erroneous. See Fed. R. Civ. P. 52(a). Moreover, "[i]t is now settled beyond peradventure that findings of fact do

not forfeit 'clearly erroneous' deference merely because they stem from a paper record." RCI Northeast Servs. Div. v. Boston Edison Co., 822 F.2d 199, 202 (1st Cir. 1987). Whether the evidence is sufficient to pierce the veil "is a question of law. But given the issue's fact-intensive nature, the legal threshold of evidentiary sufficiency is a relatively low one." Crane, 134 F.3d at 22. We must therefore review the record in the light most favorable to the district court's findings. See Servicos Comerciales Andinos v. General Elec. Del Caribe, Inc., 145 F.3d 463, 466 (1st Cir. 1998).

The district court decided the case on a stipulated record containing deposition transcripts and affidavits from key Springfield, ABR and union leaders. Not surprisingly, the parties offered divergent views of the circumstantial evidence. Springfield relied on ABR's formal corporate separateness from the railroad, and emphasized the undisputed fact that ABR had been formed prior to the labor dispute and was engaged in a separate, legitimate business (paper products manufacturing). It asked the court to view Springfield's suggestion to ABR that it perform switching as merely a friendly business gesture from one independent corporation to another, designed solely to promote each company's efficiency. The Unions, by contrast, argued that the same evidence showed that Springfield sought out ABR's

assistance only to thwart the RLA processes. In support of its interpretation, the Unions emphasized common ownership of Springfield and ABR, the chronology of events, and the fact that the same Springfield managers involved in the failed labor negotiations were instrumental in persuading ABR to perform switching for Lincoln and Champion. In a case submitted for judgment on a stipulated record, the district court resolves disputed issues of material fact. See Boston Five Cents Sav. Bank v. Secretary of the Dep't of Hous. and Urban Dev., 768 F.2d 5, 11-12 (1st Cir. 1985).

While the appellants (and our dissenting colleague) continue to characterize Springfield's motivation as benign, the district court plainly rejected the claim that ABR was acting as an independent corporation. Rather, the court found that the conduct of Springfield was analogous to that of the carrier in Burlington, a case in which the carrier used a subsidiary alter ego to violate its collective bargaining agreement and the RLA. Noting that it could "look beyond the surface . . . to see whether the disputed practice is in reality an attempt to evade the collective bargaining agreement," the court concluded that Springfield's arrangement with ABR was an "attempt[] to change unilaterally the terms" of its deal with the Unions. The court pointed to both the "close family relationship" among the

corporations and the fact that the transfer of switching came only after Springfield's "failed attempt to negotiate more favorable terms for the work that ABR is now doing on a nonunion basis." The court drew a distinction between Springfield assisting ABR in taking over its own switching -- a fairly common industry practice -- and Springfield's suggestion that ABR should travel to other Springfield customers and perform the switching work that the Unions had refused to do for lower pay.

While the evidence supporting the district court's finding that Springfield used ABR to circumvent its collective bargaining agreement with the Unions was circumstantial, there was, contrary to the insistence of the dissent, sufficient evidence to support that conclusion. First, the district court properly noted that the overlap in ownership between Springfield and ABR was almost total. Three of the four individuals who owned Springfield (through the Guilford holding company) were the sole owners of ABR. At the time the dispute arose, the three corporations (Guilford, Springfield and ABR) had the same four directors: specifically, the three owners of ABR, plus Richard Kelso.

Although the "close family relationship" between ABR and Springfield is not dispositive of the veil-piercing inquiry, the district court also properly relied upon a chronology of

events which supports an inference that Springfield was using ABR to violate its collective bargaining agreement and defeat the RLA status quo requirements. Notably, Springfield only invited ABR to start performing switching for its customers after Springfield was unable to convince the Unions to accept wage concessions. Also, the Springfield vice-president who approached ABR, Sydney Culliford, was described by one union leader as the key player in the failed labor negotiations. Likewise, the ABR executive who decided that the wood products shop should start switching for Springfield customers was David Armstrong Fink, who in addition to being President of ABR was also an owner of Guilford and director of Springfield (and several months later, Springfield's executive vice-president). It was not unreasonable for the district court to conclude that the work was shifted to ABR after the first round of failed negotiations as a way of pressuring the Unions to accept wage concessions, and circumventing the RLA strictures that bar these unilateral changes.[7]

---

[7]The dissent insists that RLA veil piercing requires "fraudulent intent" or "moral culpability." Post at 40. Without necessarily accepting that specific formulation of the requirement, there is no question that a manipulation of the corporate form to circumvent a federal regulatory scheme is sufficiently blameworthy to meet this standard. See First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611, 630 (1983) ("[T]he Court has consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies.")

The dissent argues that this reading of the evidence must be rejected because ABR only performed switching for Springfield customers Lincoln and Champion after they had already (and independently) decided to stop using Springfield for switching. However, the only evidence that Lincoln and Champion had chosen to end their switching agreement with Springfield before ABR was presented as an alternative comes from assertions by Springfield managers and officers. The district court did not credit this version of events in its opinion, and nothing compelled it to do so. Springfield and ABR officials participated together in discussions with Lincoln and Champion over who should perform the switching. ABR President David Fink (an owner of Springfield through Guilford) stated at his deposition that he and Springfield's Culliford met together with Lincoln managers to discuss how ABR could fulfill switching needs previously performed by the Unions. Other evidence indicates that even after ABR took over the day-to-day switching work, Lincoln saw ABR as simply the non-union switching arm of Springfield. On one occasion when Lincoln needed to change its switching schedule, it wrote a letter to Springfield, not ABR, informing it of its needs.

Moreover, even after Springfield directed[8] switching work to ABR, and even after this litigation was filed, it continued to seek wage concessions on switching from the Unions. See Burlington, 862 F.2d at 1276 n.6 ("If [carrier] and [subsidiary] were truly distinct entities, further negotiation would have been moot" following the decision to transfer work to the subsidiary.). One union leader, Michael Twombley, claims that Culliford– the Springfield Vice-President who had suggested that ABR take over switching work to begin with– approached him and asked the Unions to make a reasonable offer so that Springfield could perform switching for International Paper mill plants. A second union leader, Michael Maloof, was told by Springfield's labor relations head, Roland Dinsdale, that Springfield wanted union concessions so that it could win switching business from the independent contractor, Rail Link.

Given that Springfield was still actively looking for switching work, it is difficult to fathom why Springfield would want to assist ABR if the latter were truly independent. Union

---

[8]The dissent claims that it is wrong to suggest that Springfield "directed" work to ABR, arguing that the district court's opinion and record only prove that "Springfield facilitated ABR's obtaining outside switching work." Post at 35 n.5. However, the district court plainly determined that Springfield had directed the business to ABR, finding that "Springfield Terminal's claim that it is not attempting to change unilaterally the terms of the collective bargaining agreement is totally implausible." As discussed above, the record supports a finding that Springfield transferred some of its switching to ABR.

negotiator Maloof asked this very question when Dinsdale told the Unions to accept wage concessions so that Springfield could compete against switching bids being made by various independent contractors. According to Maloof, Dinsdale told him that Springfield was concerned with independent contractor bids, but not with ABR, because Springfield controlled ABR.

Taken together, this evidence amply supports the conclusions that ABR was not acting as an independent company in providing switching services, that Springfield was attempting to convert two of ABR's thirty-four employees into its non-union switching arm, and that Springfield was using ABR as a lever against the Unions, pressuring them to accept lower pay by changing the status quo in the middle of negotiations. Given that a central purpose of the RLA is to block such tactics, see Shore Line, 396 U.S. at 148, the district court did not err in enjoining ABR from switching Springfield consignees while Springfield and the Unions completed the RLA mediation procedures.

## III.

In addition to the claims of improper veil piercing, the appellants raise several miscellaneous objections to the district court's major dispute determination.

## A. Change in Pay, Rules or Working Conditions

The appellants argue that the dispute was not major because it failed to produce a change in "pay, rules or working conditions" for the Unions. 45 U.S.C. § 152. According to appellants, the Unions did not provide "any documented evidence of any actual loss" and instead pointed only to "theoretical loss of wages" and minor changes in the working conditions. Moreover, the appellants claim that the Unions have actually benefitted from any changes because Springfield's railway business has increased and it has hired new union employees.

The appellants demand more loss than the law requires. The mere "prospect of having work shifted to a replacement subsidiary would constitute a change in the working conditions and practices" sufficient to trigger a major dispute. Air Line Pilots Ass'n Int'l v. Transamerica, 817 F.2d 510, 516 (9th Cir. 1987). In fact, even the loss of completely "new business," never performed by the unions, may be considered a change in the working conditions if the unions traditionally performed work of this type. See Burlington, 862 F.2d at 1276. Here, the Unions have shown far more than the prospective loss of new switching business. The exact switching work previously performed by Union workers is now being performed by non-union ABR employees. Moreover, because the Unions no longer perform this switching, some members have had to report to different locations at

different times than they otherwise would have, a manifest change in "working conditions."[9]

## B. Implicit Term

The appellants claim that the district court erred in rejecting its argument that the collective bargaining agreement "implicitly" allowed the arrangement between Springfield and ABR. If a carrier presents evidence that the challenged labor practice has been knowingly acquiesced in by the union, the challenged practice is treated as an implicit term of the collective bargaining agreement and any dispute over the meaning of that term is minor. See Maine Central R.R. Co. v. United Transp. Union, 787 F. 2d 780, 782 (1st Cir. 1986). To take advantage of the minor dispute provision, the carrier need only show that the implicit contractual term defense is not "totally implausible." Id. at 783.

The appellants argue that the Unions had previously acquiesced to Springfield allowing several of its freight customers to perform their own switching. The dissent too makes

_____

[9]The appellants also claim that any changes in pay, rules or working conditions were caused by ABR, and that Springfield cannot be held responsible for ABR's activities. As we stated above, the district court properly concluded that Springfield was using ABR to modify its collective bargaining agreement and defeat the status quo provisions of the RLA. Springfield, therefore, is responsible for changes in pay, rules and working conditions.

much of this point, noting that even before ABR started switching

for Lincoln and Champion, Springfield had assisted several mill

customers (including ABR) in taking over their own switching. The

district court, however, ruled that Union acquiescence in those

instances was totally inapposite:

> The companies have pointed only to past practices where Springfield Terminal has helped its customers take over their own switching. The unions, however, no longer quarrel with ABR doing its own switching. Instead, the unions complain because Springfield Terminal, they say, is essentially assisting ABR to act as a railroad in doing nonunion switching work for customers, specifically Terminal's customers, who would otherwise be using Springfield Terminal's union crews. There is not even arguably any such past practice. I agree with the unions that any purported reliance on past practices to justify this new arrangement is, therefore, obviously insubstantial; this is not a minor dispute.

The record amply supports the district court's past practice

findings. The Unions have never accepted the idea that

Springfield could use ABR as its non-union switching arm.[10]

---

[10]Springfield also points out that on the one occasion it used non-union employees to perform switching work, one union ignored it and the other treated it as only a minor dispute. This argument does nothing to prove union acquiescence to an arrangement like that between Springfield and ABR. From the record, it appears that the case Springfield points to involved which employees (engineers or "carmen") were allowed to perform the switching on one specific track, not whether a party related to Springfield could essentially act as the carrier's non-union switching arm.

For all of the above reasons, the judgment below is **affirmed.**

### Dissenting Opinion Follows

**STAHL, <u>Circuit Judge</u>, dissenting**.    I believe the majority misreads the record and misapprehends the federal law on piercing the corporate veil.  Consequently, I disagree with the majority's conclusion that the lower court properly pierced Springfield's corporate veil to enjoin ABR from doing switching work previously performed by Springfield.    Accordingly, I dissent.

The majority's determination that ABR is subject to the RLA depends necessarily on its affirming the district court's holding that "the close family relationship" between ABR and Springfield, <u>Brotherhood of Locomotive Eng'rs</u> v. <u>Springfield Terminal Ry.</u>, Civil No. 98-284-P-H, slip op. at 9 (D. Me. Feb. 5, 1999), justifies the conclusion that Springfield unilaterally brought about a change in working conditions in violation of the collective bargaining agreement by "direct[ing]" the Lincoln and Champion switching work to ABR.  <u>See</u> <u>ante</u> at 26.    The majority acknowledges, as do the Unions, that without finding ABR to be an

alter ego -- for which there is no record evidence[1] -- or a piercing of the corporate veil, it could not hold ABR liable under the RLA. In my view, the district court's conclusion is not sustainable.

Before proceeding to discuss the issues before us, I must contend with how the majority couches its factual recitation. The majority states its intention to "begin by sketching the facts of this labor dispute, reserving for later a more detailed discussion of the district court's findings." Ante at 2. What follows, however, intermixes predicate facts in the evidence with the actual findings the district court made. To an uninformed reader, this intermixing of facts and the district court's findings might well be quite confusing. The effect is to bolster the majority's ultimate conclusion, which is not sustainable based solely on the district court's findings, with

---

[1]The burden of proof is on the party seeking to disregard the corporate form. See National Soffit & Escutcheons, Inc. v. Superior Sys., Inc., 98 F.3d 262, 265 (7th Cir. 1996); Publicker Indus., Inc. v. Roman Ceramics Corp., 603 F.2d 1065, 1069 (3d Cir. 1979) ("The burden of proof on this issue rests with the party attempting to negate the existence of a separate entity."). In this case, aside from drawing the trial court's attention to the overlap in ownership, the Unions failed to present evidence that the court should pierce the corporate veil. There is no evidence in the record, for example, as to whether the various individuals' ownership shares in Guilford and ABR are the same, similar, or very different.

bits and pieces of evidence from the record.  I believe this approach is unfortunate.[2]

The majority suggests that ABR made each decision relating to switching solely to satisfy Springfield's goals. Neither the district court's findings nor the record supports such a contention.  In early 1998, because its operations were growing, ABR decided it needed to provide additional trackage for the storing, loading, unloading, and switching of railroad cars over the two sidetracks that it owned and over which it had exclusive use.  To satisfy its operational needs, it negotiated with its line-hauling carrier, Springfield, a standard joint use agreement, which is a contract by which a company obtains the use of a railroad's tracks for its own operations.  Under this

---

[2]This case was before the district court on a stipulated record.  When parties stipulate a record for decision, the district judge must "decide any significant issues of material fact that he discovers."  Boston Five Cents Sav. Bank v. Secretary of the Dep't of Hous. & Urban Dev., 768 F.2d 5, 11-12 (1st Cir. 1985).  Under such circumstances, we "receive[] the decision under a 'clearly erroneous' factfinding standard."  Id. at 12.  We take the findings of the district judge, and compare them with the record only to discover clear error.  See Strahan v. Coxe, 127 F.3d 155, 172 (1st Cir. 1997).

Because the majority agrees with the district court that piercing the corporate veil in the case of a close family relationship is appropriate, it is bound by the findings of the district court, which it may review only for clear error. However, this is not a case in which it is appropriate to scan the entire record to bolster the district court's ultimate conclusion.  Based on the limited facts found by the district court, I believe that its ultimate conclusion that piercing the corporate veil was proper is in error.

agreement, ABR to complement its own two tracks obtained the right to use four contiguous tracks owned and controlled by Springfield.

It is evident from the record that ABR received no special treatment from Springfield because this agreement was identical to joint use agreements the railroad previously had negotiated with other customers. Long before ABR negotiated its agreement, Springfield had entered into similar joint use agreements with S.D. Warren of Westbrook, Maine in August 1992; Specialty Minerals, Inc. of Adams, Massachusetts in October 1996; and Turners Island LLC of South Portland, Maine in October 1997. In addition, Springfield had assisted several companies without joint use agreements -- Merrill's Terminal of Portland, Maine in 1990; Hampshire Chemical of Nashua, New Hampshire in 1995; and Fort James of Old Town, Maine in 1996 -- in taking over their own switching. Like ABR, each company is a freight customer of Springfield's, each had ceased using Springfield for intraplant switching, and each had begun to perform its own switching. Moreover, in each of these instances, the shipper made the decision to do its own switching, and Springfield trained employees of each company in the operation of the trackmobile, a device used to move rail cars between tracks.

In April 1998, ABR, motivated by a desire to increase its flexibility and efficiency in switching, decided to do its own intraplant switching.[3]  The district court found that to accomplish its goals, ABR leased from Maine Central Railway a trackmobile, and two of ABR's employees received training in its operation from two Springfield employees.  See Brotherhood of Locomotive Eng'rs, Civil No. 98-284-P-H, slip op. at 4.  The record is clear that this assistance was neither unusual nor improper because it followed Springfield's normal practice when current line-haul customers elected to do their own switching. From Springfield's point of view, this assistance had a legitimate business purpose because the more efficient a customer became at switching, the more line-haul business that customer could give to Springfield.

Around the time that ABR decided to do its own switching, Lincoln and Champion complained that Springfield was unable to meet their scheduling needs for switching.  Lincoln and Champion discussed with Springfield their intention to perform their own switching.  The majority contends that Springfield

---

[3]When they filed their initial complaint, the Unions argued that the court should enjoin ABR from engaging in switching even at its own facility.  The Unions later dropped this contention and focused solely on ABR's switching for Springfield's consignees.  See Brotherhood of Locomotive Eng'rs, Civil No. 98-284-P-H, slip op. at 1 n.1.

"directed" or "transferred" switching work to ABR.  Ante at 26 &

n.8.  Respectfully, I think this assertion misstates the record.[4]

It was only after Lincoln and Champion had decided to leave

Springfield[5] that Sydney Culliford, Vice President of

_____

[4]I believe it is accurate in some sense to say that Springfield facilitated ABR's obtaining outside switching work. Culliford assisted ABR in its efforts to get Lincoln's and Champion's business only after they made it clear to Springfield that they intended to perform the work on their own.  The majority, however, uses the term "directed" in a pejorative manner and states that Springfield "transferred" its switching work to ABR.  See ante at 26 n.8.  Neither the findings of the district court nor the record supports this assertion.

[5]The district court indicated that Culliford "suggested that ABR pursue switching contracts with Springfield Terminal's customers."  Brotherhood of Locomotive Eng'rs, Civil No. 98-284-P-H, slip op. at 9.  But the district court never explicitly found that Lincoln or Champion would have used Springfield for their switching absent ABR's entry into the market.

To the extent the district court implicitly found that Lincoln and Champion would have remained customers of Springfield absent Culliford's suggestion, it committed clear error.  See Strahan, 127 F.3d at 172.  Because of the undisputed evidence in the record that Lincoln and Champion already had decided to discontinue Springfield's switching services, any finding or implication to the contrary by the district court or by the majority is not based on record evidence.

The majority notes that "the only evidence that Lincoln and Champion had chosen to end their switching agreement with Springfield before ABR was presented as an alternative comes from assertions by Springfield managers and officers" and that "[t]he district court did not credit this version of events in its opinion."  Ante at 25-26.  While it is true that only David Armstrong Fink and Culliford testified that Lincoln and Champion already had decided to cease the use of Springfield for switching, the Unions neither attempted to discredit them in cross-examination nor presented evidence to the contrary. Indeed, the district court never expressed doubt about the veracity of this testimony.  Therefore, the only conclusion the

-41-

Transportation for Springfield, suggested to David Armstrong Fink that if ABR were not using its trackmobile to full capacity, it could maximize its use by also performing switching services for other industries that wished to do their own switching. Because Lincoln and Champion already had decided that Springfield could not meet their switching needs when they began to use ABR, it is illogical to suggest that Springfield "directed" or "transferred" this business to ABR. After all, a company cannot transfer business it does not have.[6]

The Unions and the majority make much of Culliford's suggestion. This suggestion, however, is unremarkable because it does not indicate that either Springfield or ABR were using the corporate form as a ruse. The record is devoid of evidence to indicate that Culliford acted at the instruction of any of the owners of Guilford or ABR when he made his suggestion to ABR management. Culliford is neither an owner nor a director of Guilford, Springfield, or ABR. More importantly, his suggestion made legitimate business sense for both companies because ABR

_____

record supports is that Lincoln and Champion already had decided to leave Springfield.

[6]Taking the majority's logic to its ultimate conclusion, and given the breadth of the injunction now in force, if a shipper on the line were to call ABR and request that it do the company's switching, that too would be prohibited under the terms of the injunction simply because of the overlap in ownership.

-42-

could maximize its use of switching capabilities otherwise underutilized, and Springfield could ensure an expansion of its line-hauling business. A helpful suggestion from one company to another does not create an alter ego relationship or provide a basis for piercing the corporate veil.[7]

The majority's assertion that the railroad's attempt to renegotiate is further proof of collusion misses the mark. Rather, Springfield's continued attempts to renegotiate its union contract indicate that the railroad desired to save its switching business if it could, but recognized the need to decrease its costs to be competitive. A more realistic view than that advanced by the majority is that if Springfield and ABR truly were colluding, once Springfield "transferred" its switching work to what the majority says is its alter ego, ABR, it would have given up on trying to renegotiate the Union contract because its goals already would have been realized.

The majority also misconstrues the applicable legal standards. After explaining that federal law controls whether to

_____

[7]The majority argues that because Springfield still engages in switching work, "it is difficult to fathom why Springfield would want to assist ABR if the latter were truly independent." Ante at 27. The majority sees collusion. Rather, and quite to the contrary, Springfield did nothing to harm its switching business by suggesting that ABR seek Lincoln's and Champion's business because Springfield, which was unable to meet their scheduling needs, already had lost them as customers.

disregard the corporate form, the majority misreads and overstates that law. The majority contends that federal common law allows courts in cases involving federal statutes to fashion new, statute-specific rules for disregarding the corporate form. I do not agree.

While the majority is correct that in ERISA cases, we have crafted "a 'less rigorous' veil-piercing standard," ante at 13, we have not crafted one that is standardless. Contrary to the majority, which contends that veil piercing typically is appropriate to effectuate legislation,[8] this court always has engaged in a more searching inquiry. See United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1092-93 (1st Cir. 1992). Common ownership alone is insufficient to

---

[8]The majority uses the purpose of the RLA, which is to prevent strikes, to conclude that it is appropriate to pierce the corporate veil to render the RLA applicable to nonrailroads. But the majority fails logically to connect these ideas. It cites Detroit & Toledo Shore Line Railroad v. United Transportation Union, 396 U.S. 142 (1969), and implies that its strong statements about the importance of the RLA justify piercing the veil in all RLA cases. Shore Line, however, is inapposite because that decision has nothing to do with piercing the corporate veil. Rather, it involved a railroad and a union that already were in mediation under the major dispute rules of the Act. See id. at 145. During mediation, the railroad itself implemented a new policy that changed a previously uncovered condition in the collective bargaining agreement. See id. at 146-47. The Court's strong statements that allowing the railroad's actions would defeat the Act's purposes, see id. at 155, neither bear weight in deciding whether to pierce the corporate veil nor help to articulate what the federal standard is.

justify piercing the veil.  See United Paperworkers Int'l Union

v. T.P. Property Corp., 583 F.2d 33, 35-36 (1st Cir. 1978); ante

at 19.   Moreover, the mere existence of a parent-subsidiary

relationship is insufficient to justify piercing the veil.[9]  See

American Bell Inc. v. Federation of Tel. Workers, 736 F.2d 879,

887 (3d Cir. 1984) ("As [the First Circuit] has explained, there

is no policy of federal labor law, either legislative or judge-

made, that a parent corporation is bound by its subsidiary's

---

[9]The district court, and the majority, relied on Burlington Northern Railroad v. United Transportation Union, 862 F.2d 1266 (7th Cir. 1988), for the proposition that courts "can look beyond the surface of purportedly similar transactions to see whether the disputed practice before it is in reality an attempt to evade the collective bargaining agreement." Brotherhood of Locomotive Eng'rs, Civil No. 98-284-P-H, slip op. at 9.  I read Burlington differently.
   In that case, to implement a new program, Burlington, the railroad, negotiated with the unions to change their collective bargaining agreement, but the unions refused. See Burlington, 862 F.2d at 1269.  In response, Burlington entered into a trackage rights agreement with Winona Bridge, its wholly owned subsidiary, which was not a party to the collective bargaining agreement, and the unions sued to enjoin them. See id.  The issue was not whether the court should pierce Winona Bridge's corporate veil; rather, it was whether the unions had acquiesced in similar past activities. See id. at 1273.  Such acquiescence can be used to show that a dispute is "minor" under the RLA. See Maine Cent. R.R. v. United Transp. Union, 787 F.2d 780, 782-83 (1st Cir. 1986). The court found that while the unions had acquiesced in Burlington's granting of trackage rights generally, they never had acquiesced in its granting them "to a wholly owned, five-employee subsidiary which utterly lack[ed] any of the necessary equipment to service such a line." Burlington, 862 F.2d at 1273.  The court, in other words, merely narrowed the scope of the unions' previous acquiescence without engaging in any alter ego analysis.

-45-

labor contracts simply because it controls the subsidiary's stock and participates in the subsidiary's management." (citing United Paperworkers, 583 F.2d at 35-36)).  Instead,

> [a] court using the federal standard should consider (1) whether the parent and the subsidiary ignored the independence of their separate operations, (2) whether some fraudulent intent existed on the principals' part, and (3) whether a substantial injustice would be visited on the proponents of the veil pierce should the court validate the corporate shield.

163 Pleasant, 960 F.2d at 1092-93.  As the 163 Pleasant court noted, "fraudulent intent is the sine qua non to the remedy's availability."  Id. at 1093; see also id. at 1095 ("Veil piercing cannot occur without some degree of moral culpability on the parent corporation's part."); American Bell, 736 F.2d at 886-87 (finding piercing appropriate only when "the corporations simply acted interchangeably and in disregard of their corporate separateness" (internal quotation marks and citations omitted)). Of course, courts will raise questions when the purpose of incorporation was to avoid a legislative dictate,[10] see Note,

---

[10]For example, in Chicago, Milwaukee & St. Paul Railway v. Minneapolis Civic & Commerce Ass'n, 247 U.S. 490 (1918), two railways had incorporated a subsidiary that owned some switching track solely to implement higher tariffs than they could collect if they owned the tracks themselves. See id. at 500.  The Court noted that "courts will not permit themselves to be blinded or deceived by mere forms or law but, regardless of fictions, will deal with the substance of the transaction involved."  Id. at 501.

Piercing the Corporate Law Veil: The Alter Ego Doctrine Under

Federal Common Law, 95 Harv. L. Rev. 853, 869 (1982), but "[t]he

true test must be whether the corporation was created for a

legitimate business purpose or primarily for evasion of a federal

policy or statute," id. at 868.

This case presents no evidence of fraudulent intent[11]

nor any evidence of a lack of corporate independence. ABR was

formed to operate a sawmill and a wood products plant. See

Brotherhood of Locomotive Eng'rs, Civil No. 98-284-P-H, slip op.

at 2. It is not a shill. It began its operations not after, or

as a result of, the railroad's failed negotiations with the

Unions, but in 1994, which was two years before the labor

contract even began. It began switching to satisfy its own

production needs. It shares with Springfield neither books,

funds, nor offices. It shares with Springfield no corporate

officers and with the exception of David Armstrong Fink, who is

the president of ABR and a vice-president of Springfield, no

common employees. Indeed, all it does share with Springfield is

some ownership congruence, but the record is silent on the degree

---

[11]I do not disagree with the majority's statement that
"manipulation of the corporate form to circumvent a federal
regulatory scheme is sufficiently blameworthy" to constitute
fraudulent intent. Ante at 25 n.7. My disagreement is with its
conclusion that such manipulation has occurred in this case.

of that overlap because it fails to indicate what percentages of each company the Finks and Mellon own.[12]

The majority buttresses its decision to pierce the corporate veil with cases that are inapplicable to the facts before us.[13] To justify disregarding the corporate form in a case

---

[12]Even if one accepts the facts as the majority relates them, under its approach, the standards by which we pierce the corporate veil will vary from one statutory context to the next with little judicial guidance as to how those standards may differ, and companies covered by these statutes will have no ready basis upon which to understand what the law now is.

[13]The majority cites two Seventh Circuit cases for the proposition that courts often pierce the corporate veil outside the parent-subsidiary context. See ante at 18 (citing C.M. Corp. v. Oberer Dev. Co, 631 F.2d 536 (7th Cir. 1980); Central Nat'l Bank of Mattoon v. Bowen Transps., Inc. (In re Bowen Transps., Inc.), 551 F.2d 171 (7th Cir. 1977)). These cases, however, lend no assistance. In In re Bowen, the court stated that it did "not believe that the equitable doctrine of piercing the corporate veil is limited to the parent-subsidiary relationship." 551 F.2d at 179; accord C.M. Corp., 631 F.2d at 539. The In re Bowen court then noted that "[t]he separate corporateness of affiliated corporations owned by the same parent may be equally disregarded under the proper circumstances." 551 F.2d at 179 (emphasis supplied); accord C.M. Corp., 631 F.2d at 539. These cases refer not to the circumstance presented -- that is, companies with mere ownership congruence -- but to one in which a parent corporation owns many affiliated corporations. Moreover, both cases make it very clear that overlap in ownership alone is insufficient to pierce the corporate veil. See C.M. Corp., 631 F.2d at 539 (noting that stock control and common officers and directors "are not sufficient by themselves to invoke the doctrine" because they "exist in most parent and subsidiary relationships" (internal citation and quotation marks omitted)); In re Bowen, 551 F.2d at 179 ("[A]lthough stock control and common directors and officers are generally prerequisites for application of the doctrine permitting the corporate veil to be pierced, that is not by itself sufficient to bring the doctrine into operation.").

with mere ownership overlap, the majority relies entirely on cases that involve wholly owned subsidiaries. See ante at 17-19 (discussing Burlington, 862 F.2d 1266; Butte, Anaconda & Pac. Ry. v. Brotherhood of Locomotive Firemen & Enginemen, 268 F.2d 54 (9th Cir. 1959)). For example, in Butte, the railway was "a wholly-owned subsidiary of Anaconda, and both corporations [were] managed by the same staff of officers from president down to secretary-treasurer." Butte, 268 F.2d at 55. ABR is not a subsidiary of Springfield or Guilford, and the companies are not managed by the same personnel. In Butte, the officers who made all major policy decisions for the subsidiary were also officers of the parent, and as one might expect, their "controlling consideration" always was "the ultimate effect" the decision would have on the parent's profits. Id. No officers of ABR are officers of Springfield or Guilford. While the majority speculates that ABR's decisions were made for the sole benefit of Springfield, no record evidence supports that conclusion.

The majority attempts to extend the rule from these parent-subsidiary cases to this case, but does not satisfactorily justify or explain the extension. The majority uses the fact that Burlington, a Seventh Circuit case, employs the phrase "the same corporate family" to justify piercing the veil in this case. See ante at 18. All of the cases Burlington cites after this

language, however, involve wholly owned subsidiaries. See Burlington, 862 F.2d at 1275 (citing Burlington N. R.R. v. United Transp. Union, 688 F. Supp. 1261, 1266-67 (N.D. Ill. 1988) (the district court opinion); International Ass'n of Machinists & Aerospace Workers v. Eastern Airlines, No. 87-1720, 1988 WL 25506 (D.D.C. Mar. 10, 1988), vacated and remanded on other grounds, 849 F.2d 1481 (D.C. Cir. 1988); Butte, 268 F.2d 54). Moreover, every time the term "corporate family" has appeared in a Seventh Circuit opinion, it has referred not to a mere overlap in ownership, but to corporations within a parent-subsidiary relationship. See In re Meyer, 120 F.3d 66, 69 (7th Cir. 1997); Fitzgerald v. Chrysler Corp., 116 F.3d 225, 228 (7th Cir. 1997); Northern Ind. Pub. Serv. Co. v. C.I.R., 115 F.3d 506, 514 (7th Cir. 1997); In re Vicars Ins. Agency, Inc., 96 F.3d 949, 950 & n.1 (7th Cir. 1996); Addis v. Holy Cross Health Sys. Corp., 88 F.3d 482, 484 (7th Cir. 1996); Kusak v. American Info. Sys., Inc., 80 F.3d 199, 201 (7th Cir. 1996); Central States, Southeast & Southwest Areas Pension Fund v. Sherwin-Williams Co., 71 F.3d 1338, 1342 (7th Cir. 1995); Baeco Plastics, Inc. v. Inacomp Fin. Servs., Inc., No. 94-3391 , 1995 WL 140720 (7th Cir. Mar. 29, 1995); First City Sec., Inc. v. Shaltiel, 44 F.3d 529, 531 (7th Cir. 1995); Sears, Roebuck & Co. v. C.I.R., 972 F.2d 858, 860-61 (7th Cir. 1992); Fought v. Evans Prods. Co. Racine Pension Plan

Agreement, 966 F.2d 304, 305 (7th Cir. 1992); Olympia Equip. Leasing Co. v. Western Union Tel. Co., 786 F.2d 794, 802 (7th Cir. 1986) (Easterbrook, J., concurring); Independence Tube Corp v. Copperweld Corp., 691 F.2d 310, 317 n.5 (7th Cir. 1982), rev'd, 467 U.S. 752 (1984); Photovest Corp. v. Fotomat Corp., 606 F.2d 704, 726 (7th Cir. 1979); Radiant Burners, Inc. v. American Gas Ass'n, 320 F.2d 314, 324 (7th Cir. 1963). The same holds true for First Circuit cases. See CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co., 144 F.3d 35, 37 (1st Cir. 1998); Donatelli v. National Hockey League, 893 F.2d 459, 466 (1st Cir. 1990); Barrett v. Continental Ill. Nat'l Bank & Trust Co., 882 F.2d 1, 3 n.2 (1st Cir. 1989); Pujol v. Shearson Am. Express, Inc., 877 F.2d 132, 136 (1st Cir. 1989); San Francisco Real Estate Investors v. Real Estate Inv. Trust of America, 701 F.2d 1000, 1001 (1st Cir. 1983); Ladd v. Brickley, 158 F.2d 212, 220 (1st Cir. 1946). The majority thus has little basis upon which to hold that Burlington's use of the phrase "corporate family" was meant to refer to anything other than the wholly owned subsidiary at issue in that case. While arguably there may be cases in which stockholders of a railroad form a nonsubsidiary for the sole purpose of circumventing the collective bargaining agreement, there is no record support for the contention that this is such a case, nor should the parent-subsidiary argument be

used to extend the doctrine here.

The majority cites <u>Minnesota Power</u> v. <u>Armco, Inc.</u>, 937 F.2d 1363 (8th Cir. 1991), for the proposition that courts have pierced the corporate veil in cases involving complex partnership schemes. <u>See</u> <u>ante</u> at 18-19. <u>Minnesota Power</u>, however, does not support the majority's contention even though it did involve a complex partnership scheme. From 1978 through 1982, the Reserve Mining Co. ("Reserve") was the wholly owned subsidiary of Armco and Republic Steel. <u>See</u> <u>Minnesota Power</u>, 937 F.2d at 1364. In 1982, Armco and Republic Steel changed Reserve into a partnership and each took an equal share. <u>See</u> <u>id.</u> Armco then transferred to its wholly owned corporate subsidiary, First Taconite, its partnership interest. <u>See</u> <u>id.</u> The Eighth Circuit saw no clear error in the district court's findings that (1) from 1978 through 1982, Reserve, which was Armco's and Republic Steel's wholly owned <u>corporate</u> subsidiary, was Armco's alter ego and (2) from 1982 through 1986, First Taconite, which as Armco's wholly owned corporate subsidiary owned a <u>partnership</u> interest in Reserve, was Armco's alter ego. <u>See</u> <u>id.</u> at 1364, 1368. That court merely held wholly owned corporate subsidiaries to be the alter ego of their parent.

The majority also cites <u>Century Oil Tool, Inc.</u> v. <u>Production Specialties, Inc.</u>, 737 F.2d 1316 (5th Cir. 1984),

quoting language that "we see no relevant difference between a corporation wholly owned by another corporation . . . or two corporations wholly owned by three persons who together manage all affairs of the two corporations." Id. at 1317. This case dealt not with the RLA, but with whether two corporations with the same ownership and control constituted a single entity under Section 1 of the Sherman Act. See id. at 1316. In Century Oil, the same three men owned and controlled both Gas Lift, which manufactured "wireline tools and gas lift valves," and Production Specialties, which sold them. Id. at 1317. Each company existed solely to benefit the other. In addition, "[b]oth corporations operated from the same physical plant." Id. The Unions concede that ABR's principal business is unrelated to the railroad's and that switching is incidental to its main business. And, while the majority thinks it immaterial that ownership and control between Springfield and ABR is not identical, the Century Oil court would disagree. See id. at 1317 n.1 ("We address only the question of the independence of two corporations under common ownership. The point at which the ownership of two or more corporations so loses its commonality as to furnish a plurality of actors . . . is not before us."). I remain unpersuaded by the majority's expansion of responsibility to companies with only some ownership congruence.

Finally, the import of the court's decision today has much significance for ABR. The RLA sets up separate procedures depending on whether a dispute is major or minor. If the dispute is minor, it will be resolved quickly through "compulsory and binding arbitration." Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 303 (1989). In contrast, major disputes endure "a lengthy process of bargaining and mediation" during which "the parties are obligated to maintain the status quo." Id. at 302. Congress designed the major-dispute procedures to prevent strikes. See Elgin, Joliet & E. Ry. v. Burley, 325 U.S. 711, 725-26 (1945). The majority's resolution of the major-minor issue will have little or no impact on the Unions because no Union jobs have been lost as a result of shippers doing their own switching; rather, Springfield in fact has provided more Union jobs since losing some of its switching business. The majority's conclusion, however, does not allow ABR, a nonrailroad and a legitimate business, the right to expand its switching operations to other entities that also desire timely and flexible switching, nor does it regain for Springfield the switching business it already has lost.

I respectfully dissent.