## UNITED STATES PUBLIC INTEREST RESEARCH GROUP, et al., Plaintiffs

v.

## ATLANTIC SALMON OF MAINE, LLC, Defendant

### No. CIV. 00–151–B–C.

United States District Court, D. Maine.

May 9, 2003.

Bruce M. Merrill, Portland, Charles C. Caldart, Seattle, WA, David A. Nicholas, Joseph J. Mann, Joshua R. Kratka, Boston, MA, for United States Public Interest Research Group, Stephen E Crawford, Charles Fitzgerald, Plaintiffs.

Elizabeth R. Butler, Pierce, Atwood, Peter W. Culley, Pierce, Atwood, Portland, for Atlantic Salmon of Maine, LLC, Defendant.

## OPINION AND ORDER ENJOINING FOR CIVIL CONTEMPT DEFENDANT, ATLANTIC SALMON OF MAINE, LLC, FROM FURTHER VIOLATION OF THE COURT'S ORDER OF FEBRUARY 13, 2003

GENE CARTER, Senior District Judge.

### I. *Procedural Status*

Before the Court is Plaintiffs' Motion to Hold Atlantic Salmon of Maine in Con-

tempt for Stocking a New Class of Fish in violation of this Court's February 13, 2003, Order (Docket Item No. 88). An evidentiary hearing on the motion was held on May 2, 2003, pursuant to Plaintiffs' Motion for an Evidentiary Hearing (Docket Item No. 90). The Court stated on the record that it was proceeding as in a civil contempt. T/Trans. at 4.[1] The parties have now filed their briefs on the issues generated by the motion and the evidence presented at the hearing.

Defendant, Atlantic Salmon of Maine, LLC ("ASM") owns and operates five salmon farms in Machias Bay, known as Stone Island, Libby Island, Starboard Island, Cross Island North, and Cross Island. ASM's other two salmon farms are known as Flint Island and Dyer Island and are located in Pleasant Bay.

ASM also owns one hundred percent of the stock of both Treat's Island Fisheries and Island Aquaculture Company ("IAC"). Treat's Island Fisheries, located in Cobscook Bay, consists of four farms, not involved as yet in the present controversy. IAC, located in Blue Hill Bay, consists of three farms, including two pens at Harbor Scragg, where the smolt were stocked on April 30, 2003. T/Trans. at 18–19. An ASM production manager manages the IAC sites. Recommended Decision at 2. T/Trans. at 28–29, 38–39.

Plaintiffs consist of United States Public Interest Research Group, a national organization dedicated to environmental protection, and two individuals, Stephen Crawford and Charles Fitzgerald, members of the United States Public Interest Research Group (collectively referred to as "USPIRG"). USPIRG initiated this citizen suit claiming that ASM's salmon farms release pollutants into the water in violation of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* The Magistrate Judge entered on February 19, 2002, her Recommended Decision (Docket Item No. 49) on cross-motions for summary judgment, recommending that the Court deny Defendant ASM's Motion for Summary Judgment and grant Plaintiffs' Motion for Summary Judgment on the issue of liability for violation of the Clean Water Act and grant declaratory relief providing that Defendant ASM "is required to obtain an MEPDES permit from the State of Maine or an NPDES permit from EPA in order to lawfully discharge pollutants into Machias Bay or Pleasant Bay." Recommended Decision at 34–35. The Magistrate Judge also recommended that the Court schedule a hearing on the issue of what, if any, civil penalty or injunctive relief is appropriate in the case. The Court affirmed the Recommended Decision. *See* Order Affirming Recommended Decision of the Magistrate Judge (Docket Item No. 53). The Order by which the Court did so stated in pertinent part:

> (5) Declaratory relief is hereby GRANTED providing that Defendant Atlantic Salmon of Maine, LLC is required to obtain an MEPDES permit from the State of Maine or an NPDES permit from the Environmental Protection Agency in order to lawfully discharge pollutants into Machias Bay or Pleasant Bay.

After further proceedings exploring possible settlement potentialities, the Court, with the agreement of the parties, set the matter for nonjury trial on the remedial

---

1. There are two transcripts which are cited herein. One is the transcript of the April 25, 2003, oral argument. References to it are in the form "Trans. at ___" with insertion of the appropriate page reference. The second transcript is that of the evidentiary hearing on the contempt motion of May 2, 2003. References to it are in the form "T/Trans. at ___" with the page reference.

and injunctive relief aspects of the case. That trial was held on October 8, 9, and 15–17, 2002. The issues so generated were taken under advisement at the conclusion of the hearing. Briefing by the parties was completed on January 13, 2003. Thereafter, the Court entered the Order of February 13, 2003 (Docket Item No. 84), the alleged violation of which generates the present Motion for Contempt, and which reads as follows:

At the conclusion of the damages hearing in this case, the Court requested that counsel advise the Court of Defendant's plans for introducing a new class of fish into its net pens. On January 13, 2003, Atlantic Salmon of Maine, LLC notified the Court that it does plan to introduce a new class of fish into its net pens in the Spring of 2003. Having found that Atlantic Salmon of Maine is in violation of the Clean Water Act, the Court ORDERS that Defendant Atlantic Salmon of Maine, LLC not introduce any new class of fish into *its net pens* until further order of this Court in order to afford the Court the opportunity to adjudicate the remedial issues that remain outstanding for decision before further action is taken by Defendant.

*Id.* (emphasis added). This order was precipitated by defense counsel's Letter Status Report (Docket Item No. 83), reading in pertinent part:

At the conclusion of the hearing, you requested that you be advised of the plans of each Defendant for introducing a new class of fish into their net pens.

.     .     .     .     .

Atlantic Salmon of Maine, LLC does currently plan to introduce a new class of fish into its net pens this Spring,

probably during the first two weeks in May. The timing of the stocking is dependent on three factors: (1) the size of the hatchery fish; (2) the water temperature in the hatchery; and (3) the water temperature at the net pen sites.

Atlantic Salmon of Maine, LLC's plans are as follows: It currently has fish at its Starboard Island site. Those fish were stocked in the Spring of 2002. It plans to split those fish into two groups. One group will be put in pens at Stone Island and the other group will be put in pens at Libby Island. Both those sites have been fallowed for more than two years.

*Id.*

The Court's intent in entering the Order of February 13th was to preserve the *status quo* as to the circumstances under which Defendant ASM was discharging pollutants into Maine waters as of the end of the October hearing so that Defendant would not evade the potential effect of the Court's ruling, still under advisement, on the remedial and injunctive relief aspects of the case[2] and/or place itself in a position to prolong its continuing illegal discharge of pollutants into Maine waters for another two or three years by the introduction at aquaculture sites of a new year-class of fish before the Court could rule on the remedial-injunctive relief aspects. The Court sought to prevent the creation of a situation where ASM could once again act at the interstices of the regulatory/judicial process and plead, once again, its self-created economic harm as a basis to be excused from abating the continuance of its practices, adjudged in the prior proceedings herein to be illegal without the specified permits.

---

**2.** It should be noted that in addition to the February 13, 2003, Order, ASM was under the constraints imposed by the *declaration* in the Court's June 17, 2002, Order that it could not discharge pollutants from its own pen sites without an MEPDES or NPDES permit.

On April 4, 2003, defense counsel filed a motion seeking a conference with the Court (Docket Item No. 85) concerning Defendant ASM's desire to stock a new year-class of fish consisting of 1,200,000 smolt. Defense counsel filed a second motion seeking a conference (Docket Item No. 86) on April 21, 2003. The Court heard counsel on the record on April 25, 2003, on both motions. *See* Transcript of April 25, 2003, Oral Argument. At the oral argument, the Court opened the discussion by saying that it had been apprised of ASM's intention by the two letter motions for a conference and that "[i]t strikes me that maybe Atlantic Salmon is looking for guidance and comfort from the Court as to what the consequences of that [intended] action might be. I'll hear what you have to say, Mr. Culley." Trans. at 3. Defendant's counsel responded that the February 13th Order stated that ASM could not introduce a new year-class of fish into its pens and that:

> The purpose for a request for a conference was to bring this matter to the Court's attention to get some guidance from the Court as to what would be

necessary and appropriate to revisit the Court's order in light of the passage of time, and in light of some significant commercial exigencies existing with Atlantic Salmon of Maine.

*Id.* at 4. Counsel acknowledged ASM's understanding that "we cannot, in the face of the [February 13th] order that exists at the present time, introduce any fish into Atlantic Salmon net pen sites." *Id.* at 5. Ultimately, defense counsel stated the crux of ASM's purpose to be that

> it is apparent that the Board of Environmental Protection, and in fact all the agencies realize[,] and recognize that salmon farming is going to be permitted under conditions, that it would be extremely tragic if because of this window of time between which a permit can be in place and when this Court can enter its final decision, that this company at least would be put out of business by its inability to introduce fish at this time.[3]

*Id.* at 11.

The Court's colloquy with defense counsel came ultimately to a discussion of how

---

**3.** The Court notes that it had previously indicated to counsel that it did not agree with defense counsel's assumption that the issuance of a State MEPDES or a NPDES permit would resolve the issue of whether ASM would be permitted to operate as it had in the past and would not be "a definitive event" resolving the case. *Id.* at 7.

The realization of this purpose of ASM (as described by defense counsel) to capitalize on a "window of time" that existed at the interstices of effective regulatory/judicial action was precisely what the Court had sought by the February 13th Order to foreclose. Defense counsel's candid articulation of ASM's purpose, in language describing with clarity the specific temporal conduct which the Court purposed in entering the Order to foreclose, could not more clearly show that ASM was well aware of what type of activity the Court had sought to bar by that Order. It embarked on the realization of this purpose in the light of the prior declaration that it could

not pursue its aquaculture activities *at all* without an MEPDES or NPDES permit, neither of which it then had, and with a clear understanding of what the Court intended to prohibit it from doing.

The Court does not understand ASM to argue that it *misunderstood* the Court's Order because of an ambiguity as to what the Court meant in the Order by "its pens." Rather, it argues that it interpreted that language to unambiguously mean those pens leased in the name of ASM, and it is unabashed about asserting that it perceived a basis to evade the clear intent of the Order that ASM's smolt not be stocked by using someone else's pens. It is difficult to believe that ASM and its counsel did not perceive the knife-edge character of that position, especially after receiving Plaintiff's counsel's faxed letter of April 28, stating:

> We have just read the transcript of last Friday's hearing, and assume you have now read it as well. At the hearing, Judge Carter stated:

an appropriate proceeding could be brought before the Court to generate the issues that ASM apparently wished to have the Court address. That exchange ran as follows:

MR. CULLEY: Well, you Honor, then what I hear the Court saying is that we need *to file a motion* with this Court to amend this order, for relief *from this order.*

THE COURT: I think the only response that I can make here today to that is the following:

That my intent at the time of the entry of the [February 13th]order was that the defendant, ASM, should not put any fish *in the coastal waters of Maine* without the designated pollution discharge permits required by the Clean Water Act. The Court so declared with respect to Machias Bay and Pleasant Bay as recommended by the Magistrate Judge. It reserved for decision after further trial proceeding, as was originally agreed between the parties with the Court, that the extent of the injunctive relief, if any, to be given would be resolved thereafter, and that included ultimately whether ASM would be permitted to operate its pens at all in any location.

That is within the ambit of the decisional process.

MR. CULLEY: I'm sorry, your Honor, what order are you referring to?

THE COURT: That's the [February 13th]order. Then let me just say that because in the subsequent trial proceedings on the damages and injunctive relief phase of the case, there was an indication given by Atlantic Salmon of Maine that it might plan to put a new class of fish in its pens in the spring of 2003 before the Court could rule on damages and injunctive relief, the Court asked you, as Atlantic Salmon of Maine's counsel, to advise the Court if Atlantic Salmon intended to act on such claim? [sic]

You advised me by your letter of January 10th on behalf of Atlantic Salmon, and that is docketed at item 83, that Atlantic Salmon currently planned to do so.

And the Court, in consequence thereof, issued its interim order of February 13 ordering that ASM, "not introduce any new class of fish into its net pens until further order of this Court," that is docket item 84.

I viewed that to be necessary in order to preserve the full scope of the Court's authority to act in the damages [and] injunctive relief part of the proceedings.

Now it appears to me that to the extent that it is claimed that it is not clear from those orders what the Court's intent was or is, it is subject to challenge by Atlantic Salmon of Maine by taking some kind of action, and that action being tested by some kind of subsequent litigation or proceeding. And I'm con-

---

So what the outstanding orders of this Court now prohibit is ASM from putting fish[,] or its agents or subsidiaries, in my view, of putting the fish in their respective pens.
Tr. 22:19–22. Given Judge Carter's unambiguous interpretation of the scope of his February 13, 2003 order, please be advised that if a new class of fish is introduced into Island Aquaculture's net pens Plaintiffs will move for a finding that ASM is in contempt

and for a preliminary injunction ordering the fish to be removed.
Declaration of Bruce Merrill (Docket Item No. 89, Exhibit D.)
ASM clearly embarked on its stocking of the smolt with a clear understanding that that conduct would likely be taken by its adversaries in the litigation and by the Court as an evasion, at best, and a violation, at worst, of the February 13th Order.

cerned that as of this time there is simply no justicable [sic] controversy as to the reach of the language in the order and I believe there will not be until Atlantic Salmon takes action, that is challenge [sic] by litigation, or at the very least until some action is sought through the Court *by the filing of a formal motion in these proceedings, or by the commencement of a new action.*

It is my belief that in the current state of the record ASM must act to create a controversy requiring the action of the Court, and it must assume the peril of its acts being subsequently found by the Court to be in violation of prior orders or of the law generally, including the Clean Water Act.

I can't just step in at this point, in my view, and properly give an advisory opinion to Atlantic Salmon as to what I will do in the event they go ahead and stock these fish.

*Id.* at 25–28 (emphasis added).

It is now undisputed that after that colloquy with counsel, ASM caused its hatchery smolt to be stocked at IAC's Scragg Island salmon farm sites on April 30, 2003, and that continued stocking of that site is planned. The plan is to stock 541,000 smolt and that possibly an additional 766,-000 may be stocked at the IAC sites. T/Trans. at 19–20 and Declaration of

Bruce Merrill (Docket Item No. 89) ¶ 2. At the time of the hearing, 100,000 of the fish had been stocked. T/Trans. at 20–21. ASM is waiting to see what the Court does on the motion before putting the other smolt in the water. *Id.* at 21.

## II. *The Legal Issue*

The new stocking precipitated the present motion by Plaintiff to enforce, by a finding of civil contempt, the Court's Order of February 13, 2003.[4] In federal question cases, such as this is, the Court looks to federal choice-of-law principles. *Brotherhood of Locomotive Engineers v. Springfield Terminal Rwy. Co.,* 210 F.3d 18, 25 (1st Cir.2000); *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 642, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981). Where the federal statute in question, here the Clean Water Act, demands national uniformity, the federal common law provides the rules of decision.[5] *Town of Brookline v. Gorsuch,* 667 F.2d 215, 220–21 (1st Cir.1981). This is especially true where, as here, questions of the enforceability of a federal court order seeking to enforce a federal statutory mandate is the immediate precipitating cause of the controversy. The obligation, on common predicates, to obey the orders of the federal court should be commonly understood and universally applied within the geo-

---

4. It is not disputed in this case that the Court has the authority, in appropriate circumstances and on a proper showing, to enforce its lawful orders by civil contempt proceedings. *United States v. Hudson & Goodwin,* 7 Cranch 32, 11 U.S. 32, 3 L.Ed. 259 (1812), says that the federal courts have implied power. The power to punish civilly for contempts is inherent in all courts and is essential to the enforcement of the judgments and writs of the courts "and consequent to the due administration of justice." *Ex Parte Robinson,* 19 Wall. 505, 86 U.S. 505, 22 L.Ed. 205 (1873); *see also Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

5. Federal common law applies here because this case arises under a comprehensive federal statute, the Clean Water Act, 28 U.S.C. § 1251 *et seq. See American Bell, Inc. v. Federation of Telephone Workers of Penn.,* 736 F.2d 879, 886 (3rd Cir.1984) (NLRA); *United States v. Ira S. Bushey & Sons, Inc.,* 363 F.Supp. 110–19 (D.Vt.1973) (Clean Water Act). "Federal policies are not to be defeated by deference to state limitations on corporate liability, and reliance on the impenetrability of the corporate veil." *United Paperworkers International Union v. Penntech Papers,* 439 F.Supp. 610, 620 (D.Me.1977).

graphical bounds of the nation. Plaintiffs, as the moving parties here, bear the burden to prove the elements of their claim of civil contempt by clear and convincing evidence. *AccuSoft Corp. v. Palo,* 237 F.3d 31, 47 (1st Cir.2001).

Initially, ASM proposed to stock the smolt in its own pens. *See* Status Report of January 10, 2003 (Docket Item No. 83) and Defendant's Motion for Conference (Docket Item No. 85). It drew back from that course and deposited the smolt, after the Court's comments of April 25, 2003, in pens leased and licensed, not to ASM directly but to IAC, its wholly owned subsidiary. In an attempt to get ownership of the smolt out of ASM and into IAC, ASM used a purchase and sale transaction between itself and IAC. ASM's theory appears to be that the stocking by IAC with smolt owned by IAC should escape the prohibition of the February 13th Order that ASM could not stock *its own* pens. This theory depends for its validity on a premise that IAC activities are separate and apart from the activities of its parent, ASM, because of their individual corporate status and that the purchase and sale transaction is not a sham. To test the sufficiency of that proposition, one must ask if the corporate veil between ASM and IAC constitutes a sufficient separation of the design and purpose of the parent from the activity of the subsidiary, on the facts and under the federal common law, to insulate the parent from liability for the acts of its subsidiary. Put another way, the question is: are the stocked pens of

IAC substantively different and separate, in terms of operational control and use of them over time, from the pens of ASM that are admittedly within the ban of the February 13th Order or are they, in disregard of the corporate veil, to be treated, for legal purposes as well as for practical ones, as pens of ASM?

The Court must determine whether the so-called "corporate veil," that legal, fictitious wall that separates one corporate entity from another, is here genuine; whether it is of such substance that the act of one corporation may confidently be said not to be, in reality, an act *done under the direction, governance, and control of another corporation;* here, ASM. If the answer is in the negative, then the "corporate veil" may be "pierced," that is, disregarded, by the Court, and the acts of the active corporation may be considered, with all their legal and real world consequences, to be those of the directorial corporation.[6]

If the corporate veil between ASM and IAC is properly to be pierced, that would translate here into the conclusion that IAC's acts of introducing the smolt into its pens are, in law and reality, the acts of ASM. Those acts would, thus, constitute a violation of the February 13th Order by ASM. Hence, the pivotal issue here is whether there is clear and convincing evidence to establish the predicates to permit the Court to push aside the corporate veil and consider the reality of the combined actions of the parties.

**6.** ASM argues in brief that ASM cannot be found in contempt because the smolt were not put in "its pens," meaning those leased to it. That miscasts the issue. The issue, properly stated, is whether, because of the dominating governance of IAC by ASM, and the resulting piercing of the corporate veil—that is, because of the conduct of ASM—the pens leased and permitted by IAC are rendered to be, in

contemplation of law, the pens of ASM (*e.g.,* "its pens") and so within the scope of the February 13th Order. The central question here is not one of construing or interpreting the February 13th Order but, rather, it is one of assessing the effect of the conduct of ASM *in the governance of its wholly-owned subsidiary,* IAC.

The Court of Appeals for the First Circuit has set the parameters of this inquiry in the following language:

> Ordinarily, courts respect the legal independence of a corporation and its subsidiary when determining if a court's jurisdiction over the offspring begets jurisdiction over the parent. *See, e.g., Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 336–37, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925); *Pathe Computer [Control Sys. v. Kinmont],* 955 F.2d 94, 96 [ (1st Cir.1992) ]; *Donatelli [v. National Hockey League],* 893 F.2d 459, 465 [ (1st Cir.1990) ]; *Escude Cruz v. Ortho Pharmaceutical Corp.* 619 F.2d 902, 905 (1st Cir.1980). But, the "presumption of corporate separateness [may] be overcome by clear evidence that the parent in fact controls the activities of the subsidiary." *Escude Cruz,* 619 F.2d at 905; *accord Third Nat'l Bank v. WEDGE Group, Inc.,* 882 F.2d 1087, 1090 (6th Cir.1989), *cert. denied,* 493 U.S. 1058, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990); *cf. Mangual v. General Battery Corp.,* 710 F.2d 15, 21 (1st Cir.1983).

*United Electrical, Radio and Machine Workers of America v. 163 Pleasant Street Corp.,* 960 F.2d 1080, 1091 (1st Cir.1992). The appropriateness of piercing the corporate veil is not determined by any single or bright line test. *Brotherhood of Locomotive Engineers,* 210 F.3d at 26.

> Federal courts are not bound by "the strict standards of the common law alter ego doctrine which would apply in a tort or contract action. . . . Nor is there any 'litmus test in the federal courts governing when to disregard corporate form.' " . . . Instead, the rule in federal cases is founded only on the broad principle that "a corporate entity may be disregarded in the interests of public convenience, fairness and equity."

*Id.* (citations omitted).

▇▇▇▇ To pierce the corporate veil, three things must be proved: lack of corporate independence, fraudulent intent, and manifest injustice. *United Electrical Workers,* 960 F.2d at 1092–93. The corporate veil may be pierced and the parent held liable for the subsidiary corporation's conduct when, *inter alia,* the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the parent's behalf. One formulation of the federal law test for piercing the corporate veil is framed as follows:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practices in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*MCI Telecommunications Corp. v. O'Brien Marketing, Inc.,* 913 F.Supp. 1536, 1541 (S.D.Fla.1995) (*citing United Steelworkers of America, AFL–CIO v. Connors Steel Co.,* 855 F.2d 1499, 1506 (11th Cir.1988), *cert. denied,* 489 U.S. 1096, 109 S.Ct. 1568, 103 L.Ed.2d 935 (1989) (*quoting United Paperworkers Int'l Union,* 439 F.Supp. 610, 618 (D.Me.1977), *aff'd,* 583 F.2d 33 (1st Cir.1978))).[7]

---

**7.** The Court notes that in the selection of the

veil-piercing test to be applied, the Court may

### III. *Findings of Fact*

#### A. *Control of IAC*

The Court finds the facts relevant to the status, activities, and interrelationships over pertinent time of ASM and IAC as set forth below. Prior to April 5, 2000, ASM and IAC were separate and distinct corporate entities both engaged in the business of salmon aquaculture on the coast of Maine. The stock of IAC was owned by William F. Marshall and Myron Sprague. ASM had no financial interest in the company.

In 2000, ASM acquired the stock of IAC by the Stock Purchase Agreement between them dated as of April 5, 2000. T/Trans. at 35; Defendant's Exhibit 2. ASM thereby acquired all the stock of IAC, and IAC became ASM's wholly owned subsidiary. Thereafter, IAC has had a five-member Board of Directors, which controls its affairs, that is made up of the members of the five-member Membership Committee of ASM. T/Trans. at 33–34. The membership of IAC's Board of Directors is identical to that of the Membership Committee, which runs ASM. *Id.* at 33. David Peterson, the CEO of ASM, T/Trans. at 17, is also one of the Board members of IAC. T/Trans. at 34. The stock purchase took place before Mr. Peterson became CEO of ASM. T/Trans. at 33. At the time of the stock purchase, Desmond Fitzgerald, who was the CEO of ASM, also became the CEO of IAC. T/Trans. at 63. He signed the "Intra–Company Service Agreement," Defendant's Exhibit 5, *for both* companies.[8] *Id.*

The Court infers from the record that from April 5, 2000, to February 16, 2001, ASM and IAC operated with Desmond Fitzgerald acting as the CEO of both companies.

As of April 5, 2000, the effective date of the stock purchase by ASM, IAC entered into an Employment Agreement, Defendant's Exhibit 6, with Myron Sprague. T/Trans. at 44. Prior to the stock purchase by ASM, Mr. Sprague had worked at IAC as "the acting manager, equivalent to general manager." *Id.* He was also a minority shareholder in IAC, holding twenty-five percent of the outstanding stock. T/Trans. at 45; *see also* Defendant's Exhibit 6. The Employment Agreement provided for his employment as IAC's site manager and, most peculiarly, in view of the fact that ASM is not a party to the Employment Agreement, provided that any increase in his compensation under the Agreement would occur "at the sole discretion" of ASM. Defendant's Exhibit 6 at 1, ¶ 4. It also provided that Mr. Sprague could not disclose any of IAC's confidential information except under the compulsion of a court order or upon authorization to do so "by a duly authorized officer" of ASM. *Id.* at 2, ¶ 7(a). Sometime prior to the hearing, Mr. Sprague has also been employed by ASM in public affairs. T/Trans. at 44. However, he also continues to be employed under the Employment Agreement by IAC. *Id.* His duties have changed over time to the extent that he has provided "general management" to IAC. *Id.*

---

consider the extent to which the relevant statute places importance on the corporate form. *See United Electrical Workers,* 960 F.2d at 1092. Under the Clean Water Act, liability attaches for "operation" as well as "ownership" of a discharging facility. *See* 33 U.S.C. § 1321(b)(7).

8. The Court notes that the Intra–Company Service Agreement is undated, so the Court cannot tell if it went into effect immediately upon ASM's acquisition of IAC. However, it appears likely that it was signed sometime before Mr. Peterson became CEO of ASM. He assumed his duties as CEO for ASM on February 16, 2001. T/Trans. at 33.

Desmond Fitzgerald, former CEO of both companies, testified that the Treat's Island and IAC subsidiaries are managed by an ASM production manager.[9] T/Trans. at 9. ASM takes responsibility for regulatory compliance of IAC in the interests of efficiency and coordination. T/Trans. at 8, 9. IAC buys the smolts it raises in its pens from ASM. *Id.* at 9. The evidence does not disclose that it has any other source of supply for smolts. ASM harvests and buys the fish raised in IAC pens. *Id.* Both the sale of smolt and repurchase of harvested fish by ASM have in the past been at cost, not market value. T/Trans. at 11. Mr. Fitzgerald also testified that ASM provides to IAC the feed it uses at the stocked pens, ASM pays for the labor at the IAC sites, and ASM pays for IAC's insurance. T/Trans. at 10. Indeed, Mr. Fitzgerald testified that the only thing IAC pays for itself, other than the purchase of smolt from ASM, was the amount that IAC might give to local charity. T/Trans. at 10.

Mr. Peterson, the current CEO of ASM and Board member of IAC, contradicted Mr. Fitzgerald on two specific IAC financial issues. Peterson testified that IAC now buys the fish feed from ASM, T/Trans. at 46, and IAC now pays for labor out of its own bank account, T/Trans. at 46–47. To the extent that some of the financial business practices may have changed under Mr. Peterson's leadership, the record nevertheless establishes that ASM controls IAC's overall finances.

Even in this instance, where ASM is attempting to show that the transfer of smolt was a legitimate sale transaction between two separate corporate entities, no money has changed hands because payment was "made" through the use of a

promissory note running between ASM and IAC. T/Trans at 61, Defendant's Exhibit 8 at Exhibit A. According to Mr. Peterson, ASM continues to harvest the fish at IAC sites then transport and sell the fish for IAC. T/Trans. at 40. As Peterson described the process, "ASM sells the fish on behalf of Island Aquaculture. The revenues are recorded at market price; we charge 60 cents for the services I have described earlier, 60 cents per pound." T/Trans. at 46. No money changes hands between the companies during the sale process either. Any fund transfer is accomplished by bookkeeping entries only. T/Trans. at 46. The record also reflects that ASM pays for IAC's insurance. T/Trans. at 10. The end result is that ASM keeps sixty cents per pound of the sale price up front on sale of the harvested fish, which presumably is entered on its books as income, and the rest of the sale proceeds, if booked to IAC, are rolled back at year end into the consolidated financial books of ASM. T/Trans. at 13 (referring to remedial hearing Joint Exhibit 155).

Mr. Fitzgerald conceded that the only reason ASM has for the maintenance of the relationship he described between IAC and ASM was to protect the integrity of IAC's leases of aquaculture sites from the State and the Army Corps of Engineers permits, which are required to use those sites for aquaculture. T/Trans. at 11–12. To change the leases and permits over to ASM's name would require reapplication for them. He said that it was desired to avoid reapplications because:

we would consider the re-application of [sic] an ocean lease process to be in question, the end result would be in question ... because I think there is a

9. His testimony consists of portions of his deposition testimony, given on March 8, 2001,

that were read into the record.

lot of unknowns right now about salmon aquaculture lease—the process of leases for salmon aquaculture in Maine right now [is] a lot in the air as far as what the Army Corps of Engineers is going to ·require or not require at a lease site. *Id.* He continued "[w]e have concerns about restrictions on use of non-North American animals, requirements for marking and tagging, restrictions around performance at the sites, and measurements of environmental parameters, etc." *Id.*

■ The Court finds that after the stock purchase of April 5, 2000, ASM assumed complete dominance and control over all the affairs of IAC and that IAC was not permitted to act independently and on its own initiative in any significant way.[10] ASM imposed its own governing management personnel at the highest corporate level on IAC [11] and rendered IAC completely dependent upon ASM for smolt, feed for its stock, payment of all of its bills except for local charitable contributions, and as the sole market for its harvested fish. All of these transfers and transactions, until the most recent one which precipitates the present motion, occurred at little or no cost to IAC. T/Trans. at 47–48.[12] IAC's only economic transac-

10. The superficial, "smoke and mirrors," character of the actual relationship between the two corporate entities is displayed somewhat ironically, by CEO Peterson's difficulty during his testimony in remembering which corporate hat he wore. When asked if the number of IAC's employees fluctuated depending on the season and its level of activity, he responded, "[i]f *we* continue to stock at Scragg, *we* will hire additional employees to manage the Scragg Island sites." T/Trans. At 36 (emphasis added). He was clearly speaking in his capacity as operating head of ASM though he professed, on inquiry by the Court, to be referring to IAC's activities. The Court finds that effort unconvincing. The exchange shows that in his own managerial thinking, CEO Peterson is not impeded by any "veil" between what he does for ASM and that which he does for IAC. When a similar exchange later occurred, T/Trans. at 53, CEO Peterson said, perhaps more candidly, that the managerial "we" meant "[a] combination of ASM and Island Aquaculture Company." *Id.*

11. Indeed, ASM was so meticulous in assuring its control of IAC operations that IAC's *Employment Contract with IAC's on-site man-ager, Myron Sprague, reserved discretionary control of two of the most important aspects of that contract, increases in Sprague's compensation and his authorization to disclose IAC's* confidential information, not to IAC *but to ASM.*

12. Defendant argues in brief that there is insufficient evidence to allow veil-piercing here, making much of the fact that IAC maintains its own corporate by-laws, record books, and tax identification number, possesses regulatory permits, and has its own employees and physical address. Defendant's Supplemental Brief (Docket Item No. 93) at 11–12. The maintenance of a separate address and the assignment by a government agency of a separate tax number simply do not speak to the totality of the relationship in operation of parent and subsidiary.

In addition, the possession of corporate by-laws, required to maintain legal recognition as a purported corporate entity, says nothing about the entity's real-life operating independence from a parent company ·that wholly owns it. Record books kept by the parent in its own offices and used by it for conducting financial transactions, T/Trans. at 49 and 74, do not persuasively show independence of the subsidiary from the parent. While a subsidiary may have its own employees, that does not establish that the parent does not use them. Indeed, the record shows that ASM manages the keeping of IAC's day-to-day financial records. T/Trans. at 46. While CEO Peterson asserted that IAC paid its own payroll, T/Trans. at 46–47, there is no objective evidence that such is or has been, in fact, the case. There is only his one-sentence assertion to that effect. No effort was made to develop his testimony on that point, a seemingly important one as it bears on operational control. His testimony was a challenge to the testimony of former CEO Fitzgerald that ASM paid for the labor at the IAC sites. T/Trans. at 10. In the absence of any financial records, testi-

tions in the course of its core business activities are carried out with and by ASM. It is not shown to have business dealings with any other entity.

The Consolidated Statement for 2000, Joint Exhibit 155, shows all of the economic results of IAC's activities as constituent parts of ASM's overall economic condition with no reflection of the fact that the economic consequences recorded result from activities by any entity other than ASM. The statement nowhere makes mention of IAC as an identifiable entity or reflects that any part of the economic condition of ASM there reflected results from activities of IAC.

Practically, IAC is simply a conduit through which ASM flows fish, feed, and services necessary to raise and harvest merchantable farm-raised salmon. All of IAC's activities are for the direct benefit of ASM, and there is no evidence that IAC retains any part of the economic reward for its activities. Everything it does, ASM could do for itself, except for the fact that it does not have leases or permits for the sites of IAC which it uses to carry on these business activities for its own benefit. The sole reason for keeping IAC in existence as a separate entity is obviously to avoid losing control of the attributes of IAC's leases and permits. But the business activities of IAC are in every respect those of ASM and ASM assiduously assumes governance of them.

It is apparent that the dominance of ASM over IAC's affairs was well known to other interested parties. The record displays that the State regulatory authorities dealt with ASM management and executive personnel when communicating about IAC regulatory issues. Plaintiffs' Exhibit 5. Andrew Fisk, the State's Agriculture Policy Coordinator for the Department of Maine Resources, acknowledged in testimony that he dealt with Mr. Peterson as CEO of ASM with respect to regulatory issues at IAC sites. T/Trans. at 29. He testified, "[w]e send it [correspondence] to individuals *of the companies. Obviously,* Mr. Peterson and Mr. Aarskog have connections or business operations with Island Aquaculture in Maine." T/Trans. at 29 (emphasis added). The evidence does not indicate that Myron Sprague had any input into regulatory matters for IAC. The Court finds that all meaningful relations concerning regulatory matters at IAC sites were carried on with top level executives or management personnel of ASM who spoke and acted for IAC. It is inconceivable that, with Peterson, Aarskog, and Steve Page, all of ASM, involved in such correspondence, communications, and discussions, any meaningful interchange on such matters was carried out with Myron Sprague, IAC's site manager, or the other seven employees of IAC who apparently were employed to do the heavy lifting necessary to care for the fish while in the pens. The absence of any evidence substantiating such an interchange is telling. The record establishes by clear and convincing evidence that ASM controls IAC's finances, management, and business operations to such an extent that there is no

mony of employees or management personnel of IAC, pay stubs, or tax records, the Court is not persuaded of IAC's independence by Mr. Peterson's statement.

The State leases and Army Corps of Engineers permits for the pen sites are, the Court finds, the only persuasive indicia of separateness between these two corporations. Indeed, the ownership by IAC of these leases and permits are the only reason for IAC's existence separate from ASM. In the face of the overwhelming evidence as to how these two corporations actually function operationally, the referenced attributes, which are fundamentally neutral in terms of *function,* are not persuasive evidence that the parent did not exercise total working governance over the subsidiary.

actual corporate independence between them.

## B. *The Wrongful Purpose*

The record also provides clear and convincing evidence that ASM consciously used IAC to evade its responsibilities to obey the February 13th Order of this Court prohibiting it from stocking smolt in its pens prior to the Court's decision on the remedial aspects of the case. This was done to avoid a 1.9 to 2.5 million dollar loss, T/Trans. at 69, if it could not put the fish in its pens.

The Court does not dispute CEO Peterson's assertion that there will be a loss if the smolt are not stocked. The extent of that loss is difficult to ascertain with precision on his description of it in his testimony. *See* T/Trans. at 69–71 and Defendant's Exhibits 17 and 18. The effort to make it appear to be a loss to IAC is

disingenuous, however. It is clear that any loss, whenever it is incurred and whatever its component parts, will in its entirety ultimately come home to ASM. There is no basis to distinguish a temporary bookkeeping loss at IAC from the financial loss that will ultimately be reflected, one way or the other, on ASM's consolidated accounting papers. The same is also true of any gain that might be contemplated to be made from the exercise.

To avoid the loss to ASM, T/Trans. at 69, ASM decided to "sell" the smolt to IAC, its wholly owned subsidiary which it fully dominated and controlled, so that the smolt could be put in IAC's pens. Yet, as of that time, ASM had not sold smolt outside the company for years, not since Peterson had been CEO of ASM. T/Trans. at 48, 54.[13]

---

**13.** CEO Peterson testified that ASM sold smolt to IAC on prior occasions at cost. T/Trans. at 39, 48. Mr. Peterson conceded also that it was "a unique transaction," in his experience, for ASM to sell smolt "outside the company." T/Trans. at 54. It is clear to the Court that the sale of the smolt in this instance was a continuance of the standing past practice of selling smolt *to IAC* at cost. Only here, the present transaction—to maintain the appearance of a genuine, arms-length transaction, a sale "outside the company"—was postured to be, apparently for the first time, for a "market price" of $1.75 per fish.

The Court finds that this market price is a fiction. It was first generated as "the perception" of Mr. Peterson and John Thibodeau, the CEO of Fjord Seafood, the owner of ASM, that the $1.75 per smolt represented market value. T/Trans. at 48. No explanation relating to the market was given for the computation of this figure. Rather, it was indicated that the figure was adopted primarily for convenience in bookkeeping entries. T/Trans. at 49. Having so conceived the figure, Mr. Peterson sought to shore it up as a true representation of market value by sending letters dated April 28, 2003, to five other Maine and New Brunswick aquaculture firms offering to sell ASM smolt to them at the $1.75 per smolt price. Yet, ASM at that time had already

applied for and received transfer permits from the State allowing the transfer of all of the smolt into IAC pens. Those permits were issued in the names of IAC and ASM. *See* Permits dated April 24, 2003, Defendant's Exhibits 11 and 12. ASM clearly had no intention to sell any of the smolt to any of the firms solicited; it had decided already to transfer the smolt to IAC so that it could have the benefits of sale of the harvested fish at maturity. Mr. Peterson's stated purpose was to verify that there wasn't a market for the smolt. T/Trans. at 50. He conceded that he did not "really expect" that someone was going to buy the smolt. T/Trans. at 50.

The offer to sell an item by a seller who has *no intent to sell in a market that does not* exist, at a specified price chosen by the offerer, hardly establishes that the price specified represents market value. The intended deception underlying the solicitation is apparent on these facts, but it is made even more graphic by the fact that one of the firms solicited was IAC, with which ASM had already formed a prior commitment to sell the smolt to it for $1.75 per fish. The Court finds no persuasive weight to these inquiries to IAC or other firms, in the circumstances, for purposes of validating a true market price.

The Court finds this exercise to be a sham aimed at shoring up the appearance of the

The Court concludes that the sale was a sham because IAC's pens, on piercing of the corporate veil, are ASM's pens and that ASM was, in reality, doing by the sale nothing any different from what it had been doing right along—putting its smolt in IAC's pens where it could direct and carry on the activities necessary to raise, harvest, and sell the fish for its own economic benefit under the cloak of the State leases and Army Corps of Engineers permits applicable to the IAC sites in IAC's name. The sale transaction was a transparent nullity. No money changed hands between ASM and IAC because a promissory note was used as consideration for the transfer of the smolt. T/Trans. at 61. The status of the fish as an asset, in reality, of ASM that would on maturity and sale generate a profit to ASM was in no way altered. Because of the unity of corporate action and the commonality of their interests, it will ultimately be of no moment to either party whether the promissory note is paid or not. ASM will receive whatever gain and sustain whatever loss is generated from the raising of the fish to maturity. The entire project of ASM to transfer the smolt to IAC and introduce them into the IAC pens was intended to get around—indeed, to violate—the spirit of the February 13th Order. The program was to do by actions of IAC, a fully dominated and subservient, wholly owned subsidiary of ASM, with ASM's fish what it conceded it could not lawfully do itself. That is the wrongful purpose ASM sought to carry out by the transaction and the violation of the Order.

## C. *The Manifest Injustice*

The entire proceeding in this litigation has been for the purpose of securing the

fair and proper enforcement of the Clean Water Act in respect to ASM's aquaculture activities. The achievement of Congress's purposes under the Act is indisputably in the public interest. The Order of February 13th was entered by the Court, on its own initiative, because it perceived, from a portion of the evidence it had heard, an indication of an intent by ASM to evade the declaration of the June 17, 2002, Order that ASM could not carry on its activities without MEPDES or NPDES permits by putting a new year-class of fish into the water before the Court's final decision on relief could be entered. The Court entered the February 13, 2003, Order to prevent ASM from accomplishing that evasion.

Defendant takes a dismissive stance on the weight to be given any expression of the Court's intent in entering the February 13th Order. In its initial written response to the motion, Defendant asserts that "[j]udicial intentions" are irrelevant to the contempt issue. Defendant's Opposition to Plaintiffs' Contempt Motion (Docket Item No. 91) at 4 n. 1. It reprises this theme in its post-hearing brief thusly:

> the court's intent of an order is not relevant when determining whether a party is in contempt. *See Project B.A.S.I.C. [v. Kemp]*, 947 F.2d at 18 ("But the court's intentions, unstated at the time the 1989 Order was entered, cannot repair the shortcomings in the original order itself.... Judicial intentions notwithstanding, 'persons may not be placed at risk of contempt unless they have been given specific notice of the norm to which they must pattern

validity of the "sale" of the smolt to IAC as a legitimate transaction at market price. In fact, there was no market price established and the "sale" was a device by ASM to transfer the smolt to IAC so that the loss, perceived

to be about to be incurred if the smolt were not put in pens by ASM, T/Trans. at 69–71, could be avoided and the February 13th Order circumvented.

their conduct.' Put bluntly, a court's intentions and its orders are two different things.") (internal citations omitted). Defendant's Supplemental Brief (Docket Item No. 93) at 4 n. 1.

There are cogent reasons why, in the circumstances of this case, the proposition, so boldly put forward, of the irrelevancy of judicial intent concerning the February 13th Order is inapposite. First, the case of *Project B.A.S.I.C.*, 947 F.2d 11 (1st Cir. 1991), on which Defendant places reliance for its assertion, does not apply in the circumstances of this case. There, the question was whether the party held in contempt could discern "fair notice" from the language of the subject court order *that it was subject to the order.* The *holding* in the case was "that, as a necessary prelude to a finding of contempt, *the putative contemnor* should have reasonably definite advance notice that a court order applies to it." *Id.* at 17 (emphasis added).

There is no such issue here. ASM is clearly disclosed from the language of the Order to be the entity whose conduct was the subject of the Order. ASM does not contend otherwise. The question here is whether ASM, *being subject to the Order without question,* acted in contempt of it by stocking the smolt in IAC's pens as opposed to "its pens" as described in the Order. That issue, in the first place, is resolved against ASM upon the piercing of the corporate veil, which makes IAC's pens, for legal purposes, ASM's pens, as they, in fact, were in the real world of ASM's daily operations.

Further, as previously pointed out, *supra* at 22 n. 3, ASM's defense here is not that it acted innocently because the February 13th Order was ambiguous and that it did not understand, for that reason, that the conduct might be in violation of the Order. Rather, ASM's position seems to be that the Order is unambiguous in its reference to "its pens" as ASM's pens and that ASM could put the smolt in the pens of another entity. Perhaps, as the result of a legitimate arms-length sale of the smolt to a third party, it could have done so. But the fact of the matter is that ASM did not do that Rather, it put the smolt in IAC's pens, knowing that it was a wholly owned subsidiary of ASM, which precipitated the issue of the piercing of the corporate veil between ASM and IAC.

The Court is satisfied that for purposes of assessing the intent *with which ASM made that choice,* it is surely relevant that before making the choice, ASM mistrusted that acting pursuant thereto might be seen by the Court to be a violation of the Order. It sought a conference with the Court to determine if the Court would "accommodate our request to stock fish with reasonable environmental safeguards," Defendant's Motion for a Conference (Docket Item No. 85) at 2. It subsequently unsuccessfully sought approval from the Court of its "contingency plan" to stock its smolt *in IAC pens.* Defendant's Second Motion for a Conference (Docket Item No. 86) at 2–3. It was told in response thereto by the Court on April 25, "[s]o what the outstanding orders of this Court now prohibits is ASM from putting fish or its agents or subsidiaries *in my view* of putting the fish in their *respective* pens." Trans. at 22 (emphasis added). It had the Court's expression of its intent forcefully brought home to it by Plaintiffs' counsel's faxed letter of April 28, *supra* at 21 n. 3. ASM then proceeded, as it had already made preparations to do, to stock the smolt in IAC pens.

All of the above goes to establish that ASM took its action knowing that the Court believed, as the Court told ASM's counsel, that the action would violate the Order. It shows that having sought the

advices of the Court on its contemplated action, it acted in direct contravention of those advices. Thus, the Court's "intent" is *relevant* to showing clearly and convincingly that ASM's conduct, as challenged, was contumacious.

The Order represented the Court's attempt to protect and further the public interest in the enforcement of the Clean Water Act and the benefits that result therefrom. The actions of ASM in stocking these smolt are a clear effort to defeat, without any legal justification, the Act's and the Court's purposes; to, in short, benefit from "a window of time" in which it perceived that it could put into the water a class of fish that the Court, and the regulatory agencies as well, might ultimately prohibit from being stocked in their respective, forthcoming proceedings. ASM did this purely for its own economic advantage. In doing so, it acted and will continue to act, if permitted to continue to raise the stocked fish, against the public interest.

## IV. *Conclusion*

On the foregoing findings of fact, the Court concludes that there is a complete lack of corporate independence from ASM on the part of IAC and that the actions of IAC in purchasing and stocking the smolts in question were, in reality, the acts of ASM acting for its own wrongful purpose to evade the February 13th Order of this Court. The pens of IAC were, in reality, used as the pens of ASM and were in fact, by every circumstance of governance and control, ASM's pens. IAC's activities in purchasing the smolt and stocking them in pens was in every way merely a facade for the operations of ASM, its dominant owner, wholly for the purpose of accomplishing the ends of that owner. The decisions and actions impelling IAC, as a corporate entity, down the road that it took in the matter had to be those of CEO Peterson and the Membership Committee of ASM. There is no indication that IAC's Myron Sprague, its site manager *cum* general manager, was consulted or that he participated in any way in those decisions and actions. On this record, IAC itself had no incentive of its own to undertake the exercise. At the end of the exercise, the record shows that it would not make any profit or financial gain for itself, but ASM would ultimately capture all of the profit realized, if any, on harvest of the fish. IAC's only incentive to stock the fish was to follow the direction of its corporate parent, ASM, as forwarded and articulated by its executive leadership led by CEO Peterson.

The recognition of IAC's separate corporate status would clearly operate to defeat public policy by permitting ASM to violate the February 13th Order of this Court and to evade its responsibilities under the Clean Water Act as determined and articulated previously by this Court in these proceedings. It is likewise clear that these two corporate entities acted together under the governance of ASM interchangeably and in total disregard of their corporate separateness both prior to the transaction here in question and subsequently.

The violation of the Order and the continued stocking of any of the smolt is, and will be in future, a manifest injustice requiring, in fairness and justice, that the corporate veil be pierced and that ASM be held responsible for the acts of sale and purchase and stocking of the fish, and such acts incident thereto, as acts of its own. *Brotherhood of Locomotive Engineers,* 210 F.3d at 26; *United Electrical Workers,* 960 F.2d at 1093. For these reasons, ASM must be enjoined from continuing the violation of the February 13th Order as set forth hereinbelow.

### V. Order Enjoining For Civil Contempt Defendant, Atlantic Salmon Of Maine, LLC, From Further Violation Of The Court's Order Of February 13, 2003

On the foregoing findings, it is hereby **ORDERED** that Defendant, Atlantic Salmon of Maine, LLC, acting by or through, directly or indirectly, its agents, officers, servants, employees, or subsidiaries, including specifically and among any others Island Aquaculture Company, Inc., or their respective officers, agents, servants, or employees, shall **forthwith CEASE AND DESIST** from any further sale of salmonid smolt to Island Aquaculture Company or any other subsidiary for introduction thereof into net pens within or adjacent to Maine waters until further order of this Court and that Defendant, Atlantic Salmon of Maine, LLC, shall pay into the registry of this Court a penalty of One Hundred Thousand Dollars ($100,-000.00) for every day after the date of this Order on which it shall sell to any of its subsidiaries or deposit or cause to be deposited any salmonid smolt into net pens within or adjacent to Maine waters; and

**IT IS FURTHER ORDERED** that Defendant, Atlantic Salmon of Maine, LLC, its officers and directors, undertake forthwith by all diligent means to **REMOVE** all salmonid smolt which it has caused to be deposited, on or since April 30, 2003, by Island Aquaculture Company after purchase from Atlantic Salmon of Maine, LLC, or otherwise, into IAC's net pens or those of any other subsidiary of Atlantic Salmon of Maine, LLC, and that it do so with sufficient expedition that any and all of said net pens shall be fully and completely fallowed no later than May 28, 2003, and that Defendant, Atlantic Salmon of Maine, LLC, pay into the registry of this Court a penalty of Ten Thousand Dollars ($10,000.00) for every day, or part thereof, after midnight on May 28, 2003, that any of said pens shall not be in a fully and completely fallowed condition.

It is **FURTHER ORDERED** that this matter be, and it is hereby, **CONTINUED** for such further action and proceedings as the Court shall deem appropriate to obtain enforcement of its orders herein.